# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAKI KAAHUMANU; MAUI
WEDDING AND EVENT PROFESSIONALS
ASSOCIATION, a non-profit
organization,
        *Plaintiffs-Appellants,*

        v.

STATE OF HAWAII, DEPARTMENT OF
LAND AND NATURAL RESOURCES;
WILLIAM J. AILA, JR.,
Chairperson*; DOES 1-5,
INCLUSIVE,
        *Defendants-Appellees.*

No. 10-15645

D.C. No.
1:09-cv-00036-SPK-
BMK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Samuel P. King, Senior District Judge, Presiding

Argued and Submitted
February 16, 2011—Honolulu, Hawaii

Filed June 6, 2012

Before: A. Wallace Tashima, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge William A. Fletcher

---

*William J. Aila, Jr., is substituted for his predecessor Laura Thielen,
as Chairperson of the Board of DLNR, pursuant to Fed. R. App. P.
43(c)(2).

# SUMMARY

### Individual Rights/Freedom of Speech

The court of appeals affirmed a judgment of the district court in part, reversed in part, and remanded. The court held that Hawaii's regulation of commercial weddings on unencumbered state beaches does not violate the First Amendment, except for a provision giving an official absolute discretion to revoke a permit at anytime and to modify it as the official deems necessary or appropriate.

Appellants including a pastor who performed religious wedding ceremonies and a business providing commercial services for weddings sued appellees including Hawaii's Department of Land and Natural Resources in Hawaii's district court, contending that DLNR's permit requirements for commercial weddings on public beaches unduly burdened their right to organize and participate in weddings, in violation of the First Amendment, equal protection, and due process. DLNR's chairperson had "absolute discretion" to revoke a permit at anytime, and to modify it "as it deems necessary or appropriate." The district court granted summary judgment for Hawaii, ruling that unencumbered beaches in Hawaii are not a traditional public forum. But even if such beaches were a traditional public forum, the court ruled, DLNR's regulations and associated guidelines were reasonable time, place, and manner regulations.

The wedding professionals appealed. DLNR challenged their standing.

[1] A plaintiff generally may only bring a claim on his own behalf, and may not raise claims based on the rights of another party. However, an association can bring claims on behalf of its members. Thus, the wedding professionals had standing to assert the litigating rights of their members. [2]

The wedding professionals also had standing to assert claims on behalf of those who sought to marry on an unencumbered state beach in Hawaii. Application of DLNR regulations to commercial weddings resulted in economic injury to the members of the wedding professionals, who organized such weddings. **[3]** Because the wedding professionals had standing, it was not necessary to consider whether the pastor also had standing.

**[4]** Turning to the plaintiffs' First Amendment challenge, the court of appeals first considered whether wedding ceremonies constitute "speech" protected by the First Amendment. **[5]** The First Amendment protects expressive conduct so long as that conduct conveys a particularized message and is likely to be understood in the surrounding circumstances. **[6]** Couples often express their religious commitments and values in their wedding ceremony—it is common for religious leaders to serve as wedding officiants. **[7]** Wedding ceremonies convey important messages about the couple, their beliefs, and their relationship to each other and to their community. The core of the message in a wedding is a celebration of marriage and the uniting of two people in a committed long-term relationship. The court of appeals concluded that wedding ceremonies are protected expression under the First Amendment.

**[8]** The government can exclude a speaker from a traditional public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. **[9]** In a nonpublic forum, regulations must be reasonable in light of the purpose served by the forum and viewpoint neutral. **[10]** The court of appeals assumed without deciding that unencumbered state beaches in Hawaii are a traditional public forum for purposes of the regulations it would uphold. For the regulations that were invalid, the court of appeals assumed without deciding that the unencumbered state beaches in Hawaii were nonpublic forums.

**[11]** A challenge to a regulation "on its face" is proper only if the statute by its terms seeks to regulate spoken words or

patently expressive or communicative conduct, such as pick-eting or hand billing. **[12]** The regulations imposing restrictions on commercial weddings did not on their face seek to regulate spoken words or patently expressive or communicative conduct. Thus, the court of appeals treated most of this case as challenge to the regulations as applied to the wedding professionals. **[13]** However, the court of appeals addressed as a facial challenge the wedding professionals' objection to the regulations that gave DLNR discretion to grant and revoke permits, and to amend their terms and conditions. It was not necessary for DLNR to have actually exercised this discretion adversely to the wedding professionals. **[14]** The court of appeals concluded that the wedding professionals could bring a facial challenge for their claim that the regulations give DLNR unbridled discretion to grant, revoke, or modify the permits.

**[15]** Reasonable time, place, and manner restrictions on speech are permissible in a traditional public forum if they are justified without reference to the content of the regulated speech, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information. **[16]** A reasonable time, place, and manner restriction for a traditional public forum can include permitting requirements.

**[17]** The court of appeals found that Hawaii's permitting requirement served a significant governmental interest—minimizing conflicting uses of limited beach area and conserving the physical resource of the beaches. **[18]** The permitting requirement was narrowly tailored to further this interest—the application process was not burdensome, as most commercial wedding permits could be obtained through a simple, online application process. **[19]** The permit conditions were also narrowly tailored, with specific time and space limitations. **[20]** The permitting requirement was content-neutral—the triggering factor for requiring a permit was that a wedding be "commercial." **[21]** There were also ample

alternative channels for expression, including county beaches and private property next to any beach. **[22]** Finally, with two exceptions, the permit requirement did not delegate overly broad discretion to a government official.

**[23]** As to the discretion DLNR reserved to revoke and modify a permit, the Ninth Circuit agreed with other circuits that have held that the viewpoint neutrality requirement includes the prohibition on a licensing authority's unbridled discretion. **[24]** A time, place, and manner regulation must contain adequate standards to guide the official's decision and render it subject to effective judicial review. There were no adequate guiding standards here, given that DLNR could revoke a permit at anytime, for any reason, and in the sole and absolute discretion of the chairperson. Further, DLNR could add terms and conditions to a permit as it deemed necessary or appropriate. **[25]** Because the potential for the exercise of such discretionary power existed, the court of appeals held that this discretionary power was inconsistent with the First Amendment.

**[26]** The court of appeals upheld DLNR's limitation on the placement of wedding accessories within the right-of-entry area, and **[27]** DLNR's insurance and indemnification/hold-harmless requirements. **[28]** The court of appeals rejected the wedding professionals' contention that DLNR's permitting requirements violated the Equal Protection and Due Process Clauses.

## COUNSEL

James Harry Fosbinder, IVEY FOSBINDER FOSBINDER LLC, Wailuku, Hawaii, for the appellants.

William Joseph Wynhoff, OFFICE OF THE HAWAII ATTORNEY GENERAL, Honolulu, Hawaii, for the appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

Plaintiffs are Laki Kaahumanu, a Native Hawaiian pastor who performs religious wedding ceremonies, and Maui Wedding and Event Professionals Association ("Event Professionals"), an association of individuals and businesses providing commercial services for weddings. Defendants are the State of Hawai'i Department of Land and Natural Resources ("DLNR"), which manages, controls and administers public lands in Hawai'i, and William J. Aila, Jr., Chairperson of the Board of DLNR.

Plaintiffs bring a First Amendment and other constitutional challenges to regulations and associated guidelines that require permits for "commercial weddings" on public beaches in Hawai'i. We uphold the regulations and guidelines in all respects but one.

## I. Background

Over 200 public beaches in Hawai'i are under DLNR's jurisdiction. *See* Beaches, Hawai'i Department of Land and Natural Resources, *available at http://hawaii.gov/dlnr/land/ forms-1/WikiPermitLocations.pdf* (last visited Feb. 10, 2012) (listing beaches). These include such beautiful beaches as Wailea Beach on Maui; Waimea Bay Beach on Oahu; and Papohaku Beach on Molokai. Many commercial companies provide services for recreational activities on Hawai'i's beaches. During the late 1990s and early 2000s, these services were largely unregulated, with the result that some public beaches became congested by commercial enterprises. For example, kayak and surf schools stored equipment on and operated from public beaches, and hotels set out chairs and umbrellas in the morning before the general beach-going public arrived.

In November 2002, DLNR began to regulate commercial activities on "unencumbered" public beaches. Unencumbered lands are public lands, including beaches, that have not been "(1) Set aside for any purpose, by statute, executive order, or other means to a governmental agency; or (2) Encumbered by lease, license, permit, easement, or other document issued by [DLNR]." Haw. Rev. Stat. § 171-1. Beaches within the jurisdiction of DLNR extend from the water's edge to the high-tide line. *See In re Ashford*, 440 P.2d 76, 77 (Haw. 1968) (holding that public lands extend to "upper reaches of the wash of waves, usually evidenced by the edge of vegetation or by the line of debris left by the wash of waves").

DLNR regulations provide, "No person shall engage in commercial activities of any kind without a written permit from the board or its authorized representative." Haw. Admin. Rules ("HAR") § 13-221-35 (2011). "Commercial activity" is defined as:

> the use of or activity on state land for which compensation is received by any person for goods or services or both rendered to customers or participants in that use or activity. . . . Commercial activities include activities whose base of operations are outside the boundaries of the unencumbered state lands, or provide transportation to or from the unencumbered state lands.
>
> . . .
>
> 'Compensation' includes, but is not limited to, monetary fees, barter, or services in-kind.

HAR § 13-221-2. On August 1, 2008, DLNR began to require permits for "commercial weddings" under the regulations already promulgated for other commercial activities.

An applicant seeking a permit for a commercial event, including a wedding ceremony, may apply by mail or may use

a "Wiki Permits" website. Ninety-five percent of permit applications are made through Wiki Permits. The welcoming page of the website, entered into the record in the district court, states, "Commercial activity for which a permit is required would include a beach wedding, a baby christening, the scattering of ashes, or the teaching of a hula class, as possible . . . . It is essential that all commercial activity for which a permit is obtained comply with the General Terms and Conditions for Commercial Activity."

The Terms and Conditions provide that a permit can reserve a "right-of-entry area" for no more than two hours. The fee for a permit is $0.10 per square foot of the requested beach area, with a minimum of $20 per "event." An applicant for a permit must obtain "comprehensive public liability insurance," naming the State of Hawai'i as an additional insured, of "at least $300,000 per incident and $500,000 aggregate." An applicant must also agree to indemnify and hold harmless DLNR for loss or damage arising out of actions by the applicant. No alcoholic beverages are allowed in the permitted area. An applicant must agree to restore the beach to its original condition after the event.

The Terms and Conditions provide further:

> No accessories, structures, devices, amplified instruments, appliances, apparatus or equipment of any type whatsoever shall be placed on or within the right-of-entry area or premises, including but not limited to the following:
>
> > arches; bowers; alters [sic]; tables; chairs; kahilis[1]; tents and or tarps; event signage

---

[1] The record does not state what a Kahili is. The Bishop Museum, which houses an extensive collection of royal Hawai'i artifacts, tells us that a Kahili is a traditional feathered standard used in Hawai'i to depict status or lineage. *See* Bishop Museum, Ethnology Database, http://data.bishopmuseum.org/ethnologydb/type.php?type=handkahili (last visited Feb. 6, 2012).

of any type including banners, sandwich boards; kiosks or carts; stanchions, posts, ropes or similar equipment for the purpose of demarcation of the right-of-entry area; and surfboards, windsurf boards, kayaks or other ocean recreation equipment;

with the exception of the following:

loose flowers, leis, bouquets, corsages or boutonnieres; unamplified musical instruments, including a conch shell; doves or butterflies for releases; a limited number of chairs as strictly necessary for the support of elderly, infirm, or disabled persons attending the event(s); cameras and camera equipment; other non-obtrusive hand-carried wedding accessories; small podium or cake stand, not to exceed three feet square in size; and ocean vessels/equipment used exclusively for the purpose of scattering ashes during authorized funeral services.

The Terms and Conditions provide no limitation on the people who may be involved in a wedding. Nor do they provide any restriction on the apparel of participants, or any limitation on what participants are allowed to say.

Paragraph 17 of the Terms and Conditions provides, "All disputes or questions arising under this right-of-entry shall be referred to the Chairperson [of the Board of DLNR] . . . . The Chairperson's decision shall be final and binding on the parties herein." Paragraph 18 provides, "The right-of-entry permit is revocable and terminable at anytime for any reason in the sole and absolute discretion of the Chairperson." Paragraph 21 provides that DLNR reserves "the right to impose

additional[ ] terms and conditions as it deems necessary or appropriate while the right-of-entry is in force."

Guidelines specifically addressed to commercial weddings were published by DLNR in the form of answers to "Frequently Asked Questions." The answers provide, among other things, "Weddings taking place on a state beach which have any component that involves the receipt of compensation for services or goods other than the services of a photographer require a permit from the DLNR." A permit is required even if the only person paid in connection with the wedding is a minister, priest, rabbi, or "other religious or nonprofit entit[y]." A civil penalty of up to $5,000 may be levied for failure to have a permit or for violation of the terms and conditions of a permit. Weddings with as few as three people (the wedding couple and a paid officiant) require a permit. The two-hour maximum period of a permit "includes set up and restoring the area after the event." Permit holders have exclusive occupancy of a "right-of-entry area" of the beach during the period of the permit, but they may not reserve any particular area in advance. Permit holders "must find an open area when they arrive at the beach" and cannot displace people who are already on the beach.

Plaintiffs filed suit in the federal district court of Hawai'i in January 2009, alleging that DLNR's permit requirements unduly burden their right to organize and participate in weddings on unencumbered state beaches, in violation of the First Amendment, equal protection, and due process. Plaintiffs contend that the regulations and associated guidelines for commercial weddings may not be constitutionally applied on any unencumbered state beach in Hawai'i. On cross-motions for summary judgment, the district court granted summary judgment to DLNR. The district court held that unencumbered beaches in Hawai'i are not a traditional public forum. In the alternative, it held that even if such beaches are a traditional public forum, DLNR's regulations and associated guidelines are reasonable time, place, and manner regulations.

Plaintiffs timely appealed.

## II.   Standard of Review

We review *de novo* a grant of summary judgment. *Hargis v. Foster*, 312 F.3d 404, 409 (9th Cir. 2002). We conduct an independent review of the facts in First Amendment cases. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1019 (9th Cir. 2009).

## III.   Discussion

### A.   Article III Standing

To establish standing under Article III, a plaintiff must show that

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180-81 (2000).

DLNR challenges Plaintiffs' Article III standing, contending that Plaintiffs have not been injured and do not face imminent threat of injury. According to undisputed evidence submitted by DLNR, more than 7,000 beach wedding permits were granted in the year since the permitting requirements were first applied to commercial weddings. Members of Event Professionals have received more than 1,700 beach wedding permits. No member has been denied a permit.

Plaintiffs who challenge a permitting system are not required to show that they have applied for, or have been

denied, a permit. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1034 (9th Cir. 2006) ("That [appellant] has never applied for a permit under the . . . [o]rdinance does not destroy its standing."). Plaintiffs must only have declined to speak, or have modified their speech, in response to the permitting system. *See Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003).

Ronald Winckler, President of Event Professionals, states that he has coordinated fewer weddings as a result of the permitting requirements. Winckler states that "[h]anging over the heads of the wedding professionals and their clients is the threat of permitted weddings being cancelled arbitrarily and without notice at the sole discretion of the DLNR." He states further that DLNR's regulations have sparked negative commentary on the internet and have made Hawaiian beach weddings less desirable. Reverend Kahu Alalani Hill, a member of Event Professionals, is the operator of Kuhina Hawaiian Weddings and Blessings. He states that permitting fees and insurance requirements have caused his wedding planning rates to go up, and that fewer couples have decided to hire him as a consequence. Hill also declares that DLNR's prohibition on the use of kahilis requires him to exclude them from his wedding ceremonies.

Reverend Ayesha Sandra Lee Furumoto, a licensed minister and a wedding and reception planner on Maui, states, "[W]e have lost weddings because prospective clients were upset that they could no longer have arches or chairs on the beach." She states further, "Even though we obey the law and buy permits, we have been twice confronted with DLNR men in dark uniforms and guns to ask for permits, in [the] beginning stages of weddings. We were legal but these incidents marred the weddings and upset wedding clients a lot." Reverend Eve Hogan does "only . . . a few weddings a month." She states, "[B]ecause I am a Reverend[,] they are quoting me upwards of $500 a year" for insurance, whereas insurance for wedding coordinators costs about $250 a year. Because of the

cost of insurance, Reverend Hogan declares, "I now have to work with a coordinator every time I do a wedding in order to get the permit." It is not clear from the record whether Furumoto and Hogan are members of Event Professionals.

**[1]** A plaintiff generally "may only bring a claim on his own behalf, and may not raise claims based on the rights of another party." *Pony v. Cnty. of L.A.*, 433 F.3d 1138, 1146 (9th Cir. 2006). However, an association can bring claims on behalf of its members. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). Plaintiff Event Professionals thus has standing to assert the litigating rights of its members, including Winckler and Hill.

"[L]imitations on a litigant's assertion of *jus tertii* are not constitutionally mandated, but rather stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig v. Boren*, 429 U.S. 190, 193-94 (1976) (citations omitted). *Jus tertii* standing is based on a litigant's assertion that the application of a statute or rule to a third party violates that party's rights. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989). "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig*, 429 U.S. at 195. *See also Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1082 (9th Cir. 1987) (court confers third party standing when it is satisfied that plaintiff will be "effective proponent[ ] of third-party rights").

**[2]** Event Professionals has Article III standing to assert claims on behalf of those who seek to marry on an unencumbered state beach in Hawai'i. As in *Craig*, application of DLNR regulations to commercial weddings has resulted in economic injury to "vendors," that is, to the members of

Event Professionals, who organize such weddings. Also as in *Craig*, members of Event Professionals are "subject to sanctions and loss of license for violation of the [regulations]," making Events Professionals "a proper party in interest to object to [their] enforcement." 429 U.S. at 193; *see also Carey v. Population Servs., Int'l*, 431 U.S. 678, 682-84 (1977) (distributor of contraceptives had standing to bring a privacy challenge against New York law limiting distribution of contraceptives on behalf of potential purchasers); *Eisenstadt v. Baird*, 405 U.S. 438, 445 (1972) (distributor of contraceptives who acted as "an advocate of the rights of persons to obtain contraceptives and those desirous of doing so" had third party standing); *Barrows v. Jackson*, 346 U.S. 249, 254-60 (1953) (seller of land who acted as an advocate of minority rights had standing to defend against racially restrictive covenant). "The legal duties created by [DLNR's challenged rules] are addressed directly to vendors such as [Event Professionals]. [Event Professionals] is obliged either to heed the [regulatory prohibition], thereby incurring a direct economic injury through the constriction of [its] market, or to disobey the [regulatory] command and suffer" legal sanction. *Craig*, 429 U.S. at 194.

**[3]** Because we hold that Event Professionals has Article III standing, we need not reach the question whether plaintiff Kaahumanu also has Article III standing. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find [one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

## B.   First Amendment

**[4]** Plaintiffs' First Amendment challenge poses three questions. First, do wedding ceremonies constitute "speech" protected by the First Amendment? Second, what is the nature of the forum? Third, are the challenged restrictions on commercial weddings permissible in the forum? *See, e.g., Flint v. Dennison*, 488 F.3d 816, 826-30 (9th Cir. 2007).

## 1. First Amendment Protection

DLNR suggests that wedding ceremonies "may not implicate First Amendment protected speech at all" because they are "personal, private, and non-political communication."

The First Amendment protects more than political speech. "[E]ven though political speech is entitled to the fullest possible measure of constitutional protection, there are a host of other communications that command the same respect." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984); *see, e.g. Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995) (First Amendment protects parades; paintings, music and poetry are "unquestionably shielded"); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677-78 (1992) (citing cases) (First Amendment protects public ritual of disseminating religious material and soliciting funds for support); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943) (First Amendment protects door-to-door religious evangelism).

**[5]** The First Amendment also protects more than just the spoken and written word. It protects expressive conduct so long as that conduct "convey[s] a particularized message" and is likely to be understood in the surrounding circumstances. *Spence v. Washington*, 418 U.S. 405, 409-11 (1974) (per curiam); *see, e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) (First Amendment protects nude dancing); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65-66 (1981) (live entertainment); *Berger v. City of Seattle*, 569 F.3d 1029, 1035-37 (9th Cir. 2009) (en banc) (balloon art and other street performances). A "narrow, succinctly articulable message" is not required. *Hurley*, 515 U.S. at 569. *See also W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 632, 642 (1943) (failure to salute a flag); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969) (right to wear an armband in a public school).

**[6]** Couples often express their religious commitments and values in their wedding ceremony. For example, it is common for religious leaders to serve as wedding officiants. *See Lewis v. Harris*, 908 A.2d 196, 201 (N.J. 2006); *Oswandel v. Comm'r*, T.C.M. (RIA) 2007-183, at *1 (T.C. 2007) (minister's duties include officiating at weddings). Couples often include religious symbols and rituals in their wedding ceremonies. *See, e.g. Pinkhasov v. Petocz,* 331 S.W.3d 285, 288 (Ky. Ct. App., 2011) ("During the ceremony, the "Ketubah" was written and executed by the parties in the presence of the required Jewish witnesses, a plate was ritualistically broken, and Pinkhasov performed the ceremonial act of lowering the veil over Petocz's face." (footnote omitted)); *R.M. v. S.R.M.*, 2008 WL 2795955, at *1 (N.Y.Sup., 2008) (listing, among others, the saptahapadhi ritual of Hindu wedding ceremonies by which bride and groom do a seven-step walk around a sacred fire with each step symbolizing a prayer for well-being in their marriage). Secular couples are often married in non-religious ceremonies that reflect their beliefs and personal commitments.

**[7]** The core of a wedding ceremony's "particularized message" is easy to discern, even if the message varies from one wedding to another. Wedding ceremonies convey important messages about the couple, their beliefs, and their relationship to each other and to their community. "[A] private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley*, 515 U.S. at 569-70. The core of the message in a wedding is a celebration of marriage and the uniting of two people in a committed long-term relationship. "Marriage is one of the basic civil rights of man, fundamental to our very existence and survival." *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (internal quotation marks and citation omitted). We have no difficulty concluding that wedding ceremonies are protected expression under the First Amendment.

### 2.    Nature of the Forum

The standards we use to determine whether DLNR's regulations and guidelines violate the First Amendment depend on the nature of the forum at issue. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). The Supreme Court has divided public forums into three categories: "traditional public forums," "designated public forums," and "limited public forums." *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 469-71 (2009); *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1134 (9th Cir. 2011). The rest of government property is either a nonpublic forum or no forum at all. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998).

**[8]** Traditional public forums are "devoted to assembly and debate" because of a "long tradition or . . . government fiat." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45 (1983)) (internal quotation marks omitted). "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.' " *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).

"Designated public for[ums] . . . are created by purposeful governmental action." *Id.* " 'The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse.' " *Id.* (quoting *Cornelius*, 473 U.S. at 802) (alterations in original). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Pleasant Grove*, 555 U.S. at 469-70.

Limited public forums are forums that the government has reserved "for certain groups or the discussion of certain top-

ics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). We have sometimes referred to the limited public forum as a "sub-category of a designated public forum." *Flint*, 488 F.3d at 830 (quoting *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001)). "In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral." *Pleasant Grove*, 555 U.S. at 469-70 (citation omitted).

**[9]** "Other government properties are either nonpublic for[-ums] or not for[ums] at all." *Forbes*, 523 U.S. at 677. In a nonpublic forum, regulations must be "(1) reasonable in light of the purpose served by the forum and (2) viewpoint neutral." *Ctr. for Bio-ethical Reform, Inc. v. City & Cnty. of Honolulu*, 455 F.3d 910, 920 (9th Cir. 2006) (quoting *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1222 (9th Cir. 2002).

The parties dispute the nature of the forum. DLNR contends that all unencumbered state beaches are nonpublic forums. Plaintiffs contend that they are all traditional public forums. Hawai'i's unencumbered state beaches vary from heavily trafficked beaches to isolated beaches accessible only by foot or watercraft. On the record before us, it is difficult to put all of Hawai'i's unencumbered state beaches into a single forum category. *See Boardley v. U.S. Dep't of the Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010) (rejecting contention that all national parks are traditional public fora because "[t]he record before this court is woefully inadequate to determine the forum status of the hundreds of national parks governed by the NPS regulations").

**[10]** We need not decide the precise nature of the forum. For the regulations we uphold, we will assume without deciding that unencumbered state beaches in Hawai'i are, as Plaintiffs contend, a traditional public forum. That is, we will assess the validity of all the regulations we uphold under the most exacting test for restrictions on forum access. For the regulations that we conclude are invalid, we will assume with-

out deciding that the unencumbered state beaches in Hawai'i are, as DLNR contends, nonpublic forums. That is, we will assess their validity under the less exacting test for restrictions on forum access.

### 3. Validity of Restrictions on Commercial Weddings

#### a. Facial or As-Applied Challenge

Plaintiffs seek to bring both facial and as-applied challenges to DLNR's regulations of commercial weddings. We conclude that they may bring only an as-applied challenge, with one exception. Plaintiffs may bring a facial challenge to the regulations giving DLNR discretion to grant and revoke the permits and amend their terms and conditions.

**[11]** In *Southern Oregon Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2004), we described the conditions under which a facial challenge to a statute or regulation may be brought:

> [T]o be subject to facial challenge, a licensing law must have a close enough nexus to expression, or conduct commonly associated with expression, to pose a real and substantial threat of the risks of censorship. [L]aws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, such as laws requiring building permits, pose little danger of censorship and may therefore be challenged only by the usual as-applied method. *In other words, a facial challenge is proper only if the statute by its terms seeks to regulate spoken words or patently expressive or communicative conduct, such as picketing or handbilling.*

*Id.* at 1135 (emphasis added; internal quotation marks and citations omitted). The law at issue in *Barter Fair* was Ore-

gon's Mass Gathering Act, which "regulates gatherings of large numbers of people overnight in open spaces." *Id.* We noted, "It is certainly possible to imagine gatherings that might be subject to the Act but are purely recreational and devoid of expressive purpose, such as some carnivals, festivals, and . . . . Nonetheless, the statute is broad enough to cover gatherings that are expressive, such as large-scale demonstrations or religious ceremonies." *Id.* We concluded "that the Act bears a sufficiently close nexus to conduct commonly associated with expression that it is subject to a facial challenge." *Id.* at 1136.

In *Food Not Bombs*, the law at issue was a municipal ordinance regulating the serving or distribution of food in public parks. 450 F.3d at 1029. Plaintiff Food Not Bombs sought to distribute free food to "highlight a connection between the lack of food for the poor and war-preparation activities of the United States government." *Id.* at 1030 (internal quotation marks omitted). We held that a facial challenge to the ordinance was not available: "Food Not Bombs does not argue that food distribution is on its face an expressive activity. Whether food distribution can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge, should one be brought." *Id.* at 1032 (internal citations omitted). We also expressly noted that plaintiffs did not challenge the licensing official's discretion in determining whether to grant or deny a permit. *See id.* at 1037 n.15 (explaining that plaintiffs did not challenge "the breadth of official discretion" but instead challenged the " 'other' requirements of time, place, and manner jurisprudence") (quoting *Galvin v. Hay*, 374 F.3d 739, 747 n.5 (9th Cir. 2004)).

**[12]** We conclude that this case is closer to *Food Not Bombs* than to *Barter Fair*. The regulations imposing restrictions on commercial weddings do not on their face "seek[ ] to regulate spoken words or patently expressive or communicative conduct, such as picketing or handbilling." *Barter Fair*,

372 F.3d at 1135. The breadth and generality of DLNR's regulation of commercial activity, combined with DLNR's failure to regulate in any manner who may officiate at a wedding, who may attend the wedding, what may be worn at a wedding, and what words may be spoken at a wedding, convince us that a facial challenge is not available. We therefore treat most of this case as an as-applied challenge. To the degree that we reject Plaintiffs' facial attack on the regulation, we also reject their overbreadth challenge. *See Pest Comm. v. Miller*, 626 F.3d 1097, 1110-1111 (9th Cir. 2010); *Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997).

**[13]** However, we address as a facial challenge Plaintiffs' objection to the regulations that give DLNR discretion to grant and revoke permits, and to amend their terms and conditions. DLNR has not actually exercised this discretion adversely to Plaintiffs, but such exercise of authority is not necessary. The Supreme Court and the Ninth Circuit have repeatedly allowed facial attacks premised on the grant of unbridled discretion to a licensing official. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988) ("[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers."); *Freedman v. Maryland*, 380 U.S. 51, 56 (1965) ("[I]t is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license."); *Long Beach*, 574 F.3d at 1020 (allowing unbridled discretion claim to proceed as facial challenge); *Seattle Affiliate of the October 22nd Coalition to Stop Police Brutality, Repression, & the Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 794 (9th Cir. 2008) (collecting cases allowing facial challenge to regulation that confers unbridled discretion on government official to restrict expressive activity).

We allow facial challenges to such discretion for two reasons:

> First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused . . . . Second, the absence of express standards [*i.e.*, unbridled discretion] makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power.

*Long Beach*, 574 F.3d at 1019-20 (omission in original) (quoting *City of Lakewood*, 486 U.S. at 757-58 (1988)).

A plaintiff must meet two requirements to bring a facial unbridled discretion challenge. "First, a plaintiff must satisfy the standing requirements of Article III by showing that the challenged provision or provisions apply to its conduct." *Id.* at 1020. As noted above, Plaintiffs have Article III standing. "Second, the challenged [regulation granting discretion] 'must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.' " *Id.* (quoting *City of Lakewood*, 486 U.S. at 759). We conclude that the grant of discretion to DLNR to administer the permitting scheme has a sufficient nexus to protected expression to satisfy this requirement.

**[14]** We conclude that Plaintiffs may bring a facial challenge for their claim that the regulations give DLNR unbridled discretion to grant, revoke, or modify the permits.

### b.  Plaintiffs' Challenge

**[15]** "[R]easonable time, place, [and] manner restrictions on speech are permissible" in a traditional public forum. *Id.*

at 1023 (alteration in original and internal quotation marks omitted) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Such restrictions in a traditional public forum are reasonable "provided [1] that they are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information." *Id.* (alterations in original and internal quotation marks omitted) (quoting *Clark*, 468 U.S. at 293).

Plaintiffs object to three aspects of DLNR's regulation of commercial weddings: (i) the permit requirement; (ii) the limitation on accessories; and (iii) the insurance and indemnification requirement. We address these three objections in turn.

### i. Permit Requirement

**[16]** A reasonable time, place, and manner restriction for a traditional public forum "can include permitting requirements." *Id.* Such a requirement must satisfy the three-part test described above for a valid time, place, and manner restriction. *See Food Not Bombs*, 450 F.3d at 1037 (assessing a content-neutral permit requirement as a time, place, and manner restriction). We have also established a fourth criterion when a permitting scheme is challenged. Such a scheme " 'may not delegate overly broad licensing discretion to a government official.' " *Long Beach*, 574 F.3d at 1024 (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)).

### (a) Time, Place, and Manner Restriction

**[17]** We conclude that the permitting requirement serves a significant governmental interest. DLNR is charged with regulating competing and overlapping uses of Hawai'i's public lands, including its public beaches. The task of DLNR is much like the task of the Park District in *Thomas v. Chicago*

*Park District*, 534 U.S. 316 (2002). In sustaining the district's permit requirement, the Supreme Court wrote:

> [T]he object of the permit system . . . is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event.

*Id.* at 322. The permitting requirement in this case allows DLNR to serve the permissible purposes described and approved in *Thomas*. The requirement is reasonably designed to minimize conflicting uses of limited beach area and to conserve the physical resource of the beaches. As the district court noted, "[the permitting requirement] is directed at keeping public beaches open to the public, towards minimizing congestion, promoting maximum use, encouraging safety and cleanliness, and assuring accountability for possible damage."

[18] The permitting requirement is narrowly tailored to further this interest. The application process is not burdensome. Most commercial wedding permits are obtained online via DLNR's Wiki Permits Online System. The online application process has two steps. The first step is to register on Wiki Permits as a user. To do so, an applicant — typically a commercial wedding planner, or a minister, priest or rabbi — fills out and mails an application to register, along with a Certificate of Insurance naming Hawai'i as an additional insured. An applicant need register only once. DLNR has no discretion to deny a registration if the applicant fills out the form and submits proof of insurance. The second step is to obtain a permit for a specific event. To do so, an applicant enters details of the event into Wiki Permits, including the beach location, date, time, number of attendees, participating vendors, and the applicant's and vendors' contact information. The applicant then pays a $20 minimum fee or $.10 per square foot of beach

space requested. Upon submission of the event details and payment of the fee, the Wiki Permits system issues a permit immediately online, which the applicant can then print. The record does not show any instance where an application has been denied.

**[19]** The permit conditions are also narrowly tailored. They further the state's interest by requiring an applicant to specify the amount of space needed for the wedding; by requiring a permit holder not to reserve space on the beach ahead of time and not to disturb people already on the beach; by limiting a permit to two hours; and by requiring that a permit holder leave the beach clean after the event or activity. Plaintiffs do not identify any way in which these conditions are overly restrictive.

However, Plaintiffs argue that DLNR's permitting requirement is not narrowly tailored because it applies to weddings as small as three individuals — the two people getting married and the minister. The President of Event Professionals states that "[b]each weddings usually involve the couple, a minister, and less than 20 guests." Plaintiffs rely on our decision in *Berger v. City of Seattle* striking down a permitting requirement imposed on street performers in a Seattle public park. *See* 569 F.3d at 1048. In *Berger*, we disapproved of the government's "registration system that govern[ed] speech in a public forum and applie[d] to groups as small as a single individual performing without an audience." *Id.* at 1058; *see also id.* at 1039; *Long Beach*, 574 F.3d at 1034 ("Advance notice and permitting requirements applicable to [groups smaller than 75 people] would likely be unconstitutional, unless such uses [of public property] implicated other significant governmental interests, or where the public space in question was so small that even a relatively small number of people could pose a problem of regulating competing uses."); *Food Not Bombs*, 450 F.3d at 1043 n.17 (noting that permitting requirements for groups less than 150 people "may well not comport comfortably with the limited governmental inter-

ests at play in public parks and open spaces"). We explained, "The presumptive invalidity and offensiveness of advance notice and permitting requirements stem from the significant burden that they place on free speech." *Berger*, 569 F.3d at 1037. We do not retreat from our holdings in these cases, but they are inapplicable here.

In *Berger*, the plaintiff settled his as-applied claims with the city and appealed from summary judgment on his facial challenge to the permitting requirement. *Id.* at 1035. We analyzed hypothetical unconstitutional applications of the permitting requirement to strike it down. *Id.* at 1046, 1056. Here, we must limit our review to Plaintiffs' challenge as applied to beach weddings. *Vincent*, 466 U.S. at 802. Nothing we say is meant to suggest that the beach use permitting requirement at issue would necessarily be valid with respect to other individuals or small groups, such as political demonstrators, street performers, or religious canvassers soliciting funds on Hawai'i's state beaches.

*Berger* identified four particular burdens imposed by the existence of a permitting requirement: (1) "the procedural hurdle of filling out and submitting a written application"; (2) "the temporal hurdle of waiting for the permit to be granted"; (3) the elimination of anonymous speech; and (4) the elimination of spontaneous speech. *Id.* at 1037-38. But those concerns do not apply to beach weddings. As described above, the permit applications are easy to fill out and submit online. The whole process can be completed within a few minutes if the applicant is already registered, as commercial wedding vendors are likely to be. And the permit is issued immediately after the online application has been submitted. Plaintiffs have expressed no interest in performing secret or spontaneous weddings. The absence of any significant burden on Plaintiffs' speech weighs heavily in the narrow tailoring analysis. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardia de Jesus*, 634 F.3d 3, 14 (1st Cir. 2011), *cert. denied*, 132 S. Ct. 459 (2011).

**[20]** Further, we conclude that the permitting requirement is content-neutral. DLNR's regulations require a "written permit" before a person can "engage in commercial activities of any kind" on unencumbered beaches. HAR § 13-221-35. Commercial activities, in turn, involve the "use of or activity on state land for which compensation is received . . . for goods or services." *Id.* § 13-221-2. The triggering factor for requiring a permit is that a wedding be "commercial," as that term is defined by DLNR. *Id.* § 13-221-2; *see also Long Beach*, 574 F.3d at 1024 (defining a content-neutral restriction as one "based on something other than the content of the speech"); *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) (determining content-neutrality by inspecting the "literal command of the restraint").

**[21]** We also conclude that there are ample alternative channels for expression. "The Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." *Ctr. for Fair Pub. Policy v. Maricopa Cnty.*, 336 F.3d 1153, 1170 (9th Cir. 2003) (internal quotation marks omitted) (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 554 (9th Cir. 1998)). The "entire medium" of a beach wedding is clearly not foreclosed. A person need not obtain a permit to conduct a commercial beach or beach-related wedding on sites other than a state beach. These alternative sites include county beaches or private property next to any beach. Non-commercial weddings on state beaches are in no way restricted by the challenged regulations.

**[22]** Finally, we conclude that, with two exceptions explained in the next section, the permit requirement does not delegate overly broad discretion to a government official. The substantive criteria for granting a permit are clear. So long as an applicant agrees to the terms and conditions of the permit

and pays the fee, the regulations leave little or no discretion to the DLNR in deciding whether to grant a permit.

### (b)   Discretion to Revoke and Modify Permit

While we are satisfied that the power to grant permits is sufficiently constrained, we conclude that the discretion DLNR has reserved to revoke a permit, and add to its terms and conditions, is not. Paragraph 18 of the Terms and Conditions provides, "The right-of-entry permit is revocable and terminable at anytime for any reason in the sole and absolute discretion of the Chairperson [of the Board of DLNR]." Further, Paragraph 21 grants DLNR "the right to impose additional[ ] terms and conditions as it deems necessary or appropriate while the right-of-entry is in force."

For purposes of our analysis in this section, we assume that the state's unencumbered beaches are nonpublic forums. In a nonpublic forum, restrictions on access must be "(1) reasonable in light of the purpose served by the forum and (2) viewpoint neutral." *Ctr for Bio-ethical Reform, Inc.*, 455 F.3d at 920 (quoting *Brown*, 321 F.3d at 1222).

**[23]** The Supreme Court has not expressly held that the viewpoint neutrality requirement includes the prohibition on a licensing authority's unbridled discretion, but at least two other circuits have expressly so held. *See Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006) ("[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints."); *Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002) ("[W]e conclude that the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement."). We agree with those circuits.

The Supreme Court has shaped the unbridled discretion doctrine with the prohibition on viewpoint discrimination in mind. In *City of Lakewood*, 486 U.S. 750, the Court sustained a facial challenge to a city ordinance conferring unbridled discretion on the mayor to deny an application for the placement of a news rack. *Id.* at 769-70. In so doing, it tied the prohibition on unbridled discretion to the constitutional requirement of viewpoint neutrality. The Court wrote,

> [A] law or policy permitting communication in a certain manner for some but not for others raises the specter of . . . viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official. As demonstrated above, we have often and uniformly held that such statutes or policies impose censorship on the public or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the . . . viewpoint of the speaker.

*Id.* at 763-64; *see also Forsyth*, 505 U.S. at 130 (condemning unbridled discretion in licensing authority as having "the potential for becoming a means of suppressing a particular point of view" (internal quotation marks omitted)); *Thomas*, 534 U.S. at 323 (premising unbridled discretion doctrine on risk that "licensing official . . . will favor or disfavor speech based on its content").

Twelve years later, in *Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217 (2000), the Court implied that the unbridled discretion doctrine is necessary to protect against viewpoint discrimination. *Id.* at 235. In *Southworth*, it examined a university rule regulating the funding or defunding of a student organization by majority vote of the student body. *Id.* It wrote, "It is unclear to us what protec-

tion, if any, there is for viewpoint neutrality in this part of the process. To the extent the referendum substitutes majority determinations for viewpoint neutrality it would undermine the constitutional protection the program requires. The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Id.* at 235. The decision-maker there was a majority of the student body in a public university, but the Court's concern for a lack of standards applies no less to a public official with unlimited discretion in administering a permitting scheme. On remand, the Seventh Circuit expressly held that the viewpoint neutrality requirement includes the prohibition on unbridled discretion. *See Southworth*, 307 F.3d at 579.

In these cases, the Supreme Court has made clear that conferring an unbridled discretion on a licensing official creates the danger of self-censorship, as well as a danger of government censorship. A citizen may hesitate to express, or refrain from expressing, his or her viewpoint for fear of adverse government action such as the denial of a permit. *See City of Lakewood*, 486 U.S. at 759 (describing "self-censorship by speakers in order to avoid being denied a license to speak" as risk of unbridled discretion). A standardless discretion also makes it difficult to detect, and protect the public from, unconstitutional viewpoint discrimination by the licensing official. *See id.* at 759 (explaining difficulty of "effectively detecting, reviewing, and correcting" censorship "without standards by which to measure the licensor's action"); *see also Thomas*, 534 U.S. at 323 (describing risk that "[a licensing official] will favor or disfavor speech based on its content," posed by vesting a public official or body with unbridled discretion).

**[24]** "[A] time, place, and manner regulation [must] contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* at 323. Adequate guiding standards are not provided here, given that DLNR may revoke a permit "at anytime." "for any reason,"

and "in the sole and absolute discretion of the Chairperson." Further, DLNR may add terms and conditions to a permit "as it deems necessary or appropriate." In some contexts, the phrase "necessary and appropriate" may sufficiently constrain the authority of a permitting official. But here, when read *in pari materia* with the Chairperson's discretionary power to revoke a permit, there are insufficient limitations on the official's authority. *See Forsyth County*, 505 U.S. at 130 ("[A permit requirement] may not delegate overly broad licensing discretion to a government official."); *see also World Wide Rush, LLC v. City of L.A.*, 606 F.3d 676, 687 (9th Cir. 2010) (stating that "a law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials") (internal quotation marks omitted) (quoting *Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996)).

**[25]** There is nothing in the record to indicate that either the Chairperson or the DLNR has ever used Paragraphs 18 and 21 to "favor some speakers and suppress others." *Barter Fair*, 372 F.3d at 1138. To the contrary, the record indicates that permits for commercial weddings have been issued as a matter of course, and that the discretionary power reserved in Paragraphs 18 and 21 has never been exercised. However, because the potential for the exercise of such power exists, we hold that this discretionary power is inconsistent with the First Amendment.

### ii.   Limitation on Accessories

**[26]** Plaintiffs challenge DLNR's limitation on accessories. With certain exceptions, the limitation prohibits "accessories" from being "placed on or within the right-of-entry area." Given the purpose of DLNR's regulation of activities on public beaches under its jurisdiction, the limitation on accessories furthers a significant governmental interest. DLNR seeks to allow commercial beach weddings, but, at the same time, *not* to allow such weddings to interfere unduly with the activities

of other beachgoers. To that end, DLNR places various limits on commercial weddings, including limits on the physical objects that wedding participants may bring onto the beaches.

On the assumption that the unencumbered state beaches are traditional public forums, we apply the three-part test appropriate to that forum. We have already described DLNR's significant interest in regulating land uses of state beaches and the ample alternative channels for beach weddings.

We also hold that DLNR's limitation on accessories is narrowly tailored to serve a significant government interest. DLNR faces a classic line-drawing problem and it has chosen to draw the line in a manner that substantially limits the adverse impact of commercial weddings on other users' enjoyment of Hawai'i's public beaches. DLNR limits a commercial wedding to the area reserved in the permit, limits the ability of wedding participants to displace other users from favored places on the beaches, limits the duration of a wedding, limits the type (and thereby the volume) of musical instruments, and limits accessories. But DLNR allows unamplified musical instruments, allows loose flowers, allows chairs for elderly or disabled attendees, allows a cake stand or podium, and allows "non-obtrusive hand-carried wedding accessories."

We construe the limitation on accessories narrowly. As we have noted earlier in our opinion, the Terms and Conditions provide:

> No accessories [nor] structures . . . shall be *placed on or within* the right-of-entry area or premises, including but not limited to the following: arches; bowers; alters [sic]; tables; chairs; kahilis; tents or tarps; event signage of any type including banners, sandwich boards; kiosks or carts; stanchions, posts, ropes or similar equipment for the purpose of demar-

cation of the right-of-entry area; and surfboards, kay-
aks or other ocean recreation equipment[.]

The use of the verb "placed," combined with the illustrative
list of prohibited accessories, strongly suggest that the limita-
tion applies only to things that are placed on the beach with-
out being held or carried by anyone. The Terms and
Conditions expressly allow "non-obtrusive hand-carried wed-
ding accessories." Plaintiffs have not identified any instance
in which DLNR prohibited the use of hand-held religious
objects such as hand-held chuppas, chalices, and small, hand-
held kahilis. We therefore construe the Terms and Conditions
as not prohibiting these objects. *Cf. Frisby v. Schultz*, 487
U.S. 474, 483 (1998) (construing statute narrowly to allow for
First Amendment activities). We see nothing in the First
Amendment that requires DLNR to allow more than what is
thus permitted by the Terms and Conditions.

The limitation on accessories is also content-neutral. Plain-
tiffs contend that the limitation impermissibly shows a "clear
preference for nonliturgical religions" and "target[s] people of
Catholic, Orthodox or Jewish faiths." We disagree. When
determining the content neutrality of a restriction, we do not
"make a searching inquiry of hidden motive" but "look at the
literal command of the restraint." *Menotti*, 409 F.3d at 1129.
The text of the limitation on accessories, which makes no ref-
erence to religion, belies Plaintiffs' contention. That the limi-
tation may have an incidental effect on the use of specific
religious implements or physical symbols does not render it
impermissible. *See Ward v. Rock Against Racism*, 491 U.S.
781, 791 (1989) ("A regulation that serves purposes unrelated
to the content of expression is deemed neutral, even if it has
an incidental effect on some speakers or messages but not oth-
ers."); *cf. Emp't Div., Dep't of Human Res. of Or. v. Smith*,
494 U.S. 872, 879 (1990) (denying religious exemption from
"valid and neutral law of general applicability" based on Free
Exercise challenge).

iii.     Insurance and Indemnification/Hold-Harmless
Requirements

**[27]** Plaintiffs also contend that DLNR's insurance and indemnification/hold-harmless requirements are impermissible. We disagree.

Paragraph 3 of Terms and Conditions provides:

Applicant shall procure at Applicant's own expense, and maintain during the entire period of the . . . permit . . . a policy or policies of comprehensive public liability insurance in an amount of at least $300,000 per incident and $500,000 aggregate insuring the State of Hawaii against all claims for personal injury, death, and property damage.

The applicant must submit a certificate naming Hawai'i as an additional insured on his or her policy.

Paragraph 4 requires the applicant to

indemnify, defend, and hold [DLNR] harmless from and against any claim . . . arising out of or resulting from: (a) any act or omission on the part of Applicant relating to Applicant's use . . . of the right-of-entry area or premises; (b) any failure on the part of Applicant to maintain the right-of-entry area or premises and areas adjacent thereto in Applicant's use and control . . . ; and (c) from and against all . . . claims by whomsoever brought or made by reason of Applicant's [failure to follow] the terms . . . [of the permit] or [federal and state law].

The insurance and the indemnification/hold-harmless requirements serve a significant governmental interest. These requirements compensate third parties and DLNR for injury

or property damage caused by the permittee. They also protect DLNR from liability to third parties caused by the permittee.

The requirements are narrowly tailored to this interest. Evidence in the record shows that the cost of insurance does not pose a substantial burden on Plaintiffs. Reverend Eve Hogan declares that she has been quoted a price of "upwards of $500 a year" for the insurance required to satisfy DLNR's permitting requirement for a commercial wedding. She states that insurance for a wedding "coordinator" would be approximately $250 a year. Reverend Hogan says that she "only do[es] a few weddings a month." *Id.* Assuming that "a few" means three, Reverend Hogan's insurance cost attributable to DLNR's permitting requirement is about $14 per wedding.

The indemnification/hold-harmless requirement is not overly broad. We invalidated an indemnification/hold-harmless requirement in *Long Beach*, 574 F.3d at 1040, but in that case the indemnification/hold-harmless clause was extremely broad. It required permittees to indemnify and hold the city harmless not only for harm caused by third parties reacting to the expressive activity of the permittees, but also for harm caused by the city to the permittees, and harm "caused by the conduct of the event" to third parties, when "conduct" included actions by the city or other parties unrelated to the permittees. *Id.*

In contrast to *Long Beach*, the indemnification/hold-harmless clause in this case does not require a permittee to hold the state harmless for all consequences of the event, including those caused by the state's own actions. The clause here is much narrower, requiring a permittee to indemnify and hold Hawai'i harmless only for "any act or omission *on the part of [the] Applicant*," "any failure *on the part of [the] Applicant*" to maintain the premises, and all "claims . . . made *by reason of Applicant's*" failure to follow the permit Terms and Conditions.

The insurance and indemnification/hold-harmless requirements are also content-neutral. *See Food Not Bombs*. *See* 450 F.3d at 1056 (Kleinfeld, J., concurring, writing for the majority) (holding insurance and indemnification/hold-harmless requirements to be viewpoint neutral). Nothing in the requirements at issue in this case turns on the type of wedding involved, its religious content, or indeed any content-based discrimination. Nor does the amount of insurance, or the price to be paid for it, vary depending on the type of commercial wedding or the content of what might be said at the wedding. *Compare id.* at 1052 (Berzon, J., dissenting).

### iv.    Conclusion

In sum, we hold that DLNR's regulation requiring a person to obtain a permit for commercial weddings on unencumbered state beaches is narrowly tailored to a significant governmental interest, is content-neutral, leaves ample alternative spaces for hosting a wedding, and does not vest too much discretion in the government official when issuing the permits. We hold that the limitation on accessories, insurance requirement, and the indemnification/hold-harmless clause also satisfy the traditional public forum standard. However, we hold invalid the grant of discretion to DLNR to revoke, or add terms to, a permit under the least exacting standard of review for a nonpublic forum.

### C.    Equal Protection and Due Process

**[28]** Plaintiffs also contend that DLNR's permitting requirements violate the Equal Protection and Due Process Clauses. We disagree.

### 1.    Equal Protection

Plaintiffs contend that the permitting requirements violate equal protection because they subject commercial weddings, but not non-commercial weddings, to regulation. They also

contend that the permitting requirements are enforced unequally, allowing much commercial activity on unencumbered beaches without requiring permits for that activity.

We recognize that the right to marry is a fundamental right. *See Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (recognizing right to marry as "of fundamental importance"). But DLNR's regulation of commercial weddings on unencumbered state beaches does not impinge on the right to marry. Freedom of expression is also a fundamental right under the First Amendment. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n.1 (1995) (listing the "right of free speech" as a fundamental right). But for the reasons given above, DLNR has not violated the First Amendment rights of Plaintiffs. We therefore do not subject DLNR's regulation of commercial weddings to the hard-to-satisfy strict scrutiny test. Rather, we apply the more lenient rational basis test.

The record in this case makes clear that commercial beach weddings in Hawai'i are an important business. DLNR began requiring permits for commercial weddings on August 1, 2008. In a declaration signed a year later, on August 8, 2009, the Chairperson of the Board of DLNR stated that "commercial wedding operators have applied for and received permits for over 7,000 events." The state has provided a declaration of a "supervising land agent" employed by DLNR who states, "The department is aware that non commercial weddings are occasionally conducted on state unencumbered beaches. The department does not know the exact number but believes it is relatively small." Plaintiffs have not provided any evidence of the number of non-commercial weddings performed on unencumbered beaches. Given the large number of commercial beach weddings, and the relatively small (though undetermined) number of non-commercial beach weddings, DLNR clearly has a rational basis to regulate commercial beach weddings but to leave non-commercial beach weddings unregulated.

Plaintiffs argue for the first time on appeal, without supporting evidence in the record, that DLNR enforces its permit requirement only for commercial weddings, leaving the permit requirement for other commercial activities unenforced. Plaintiffs have waived that argument by not raising it in the district court. *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1033 (9th Cir. 2011).

## 2.   Due Process

Plaintiffs' due process argument is based on its contention that DLNR's regulation of commercial beach weddings violates the First Amendment. We have already rejected that contention.

Plaintiffs also raise another due process claim, arguing that DLNR's permitting requirement is unconstitutionally vague. This challenge fails because the statute is sufficiently definite as applied to commercial wedding organizers and their prospective clients. *See Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346 (9th Cir. 1984).

## Conclusion

We uphold the constitutionality of DLNR's regulation of commercial weddings on the state's unencumbered beaches in all respects but one. The only provisions that violate the First Amendment are Paragraphs 18 and 21 of the Terms and Conditions, giving to the Chairperson of the Board of DLNR the authority to revoke an already issued permit "at anytime and for any reason in [his or her] sole and absolute discretion," and giving to DLNR the authority to add terms and conditions to an already issued permit such "as it deems necessary or appropriate."

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**. Costs on appeal to appellees.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2012 Thomson Reuters.