**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

IMATTER UTAH, an unincorporated
association; RYAN PLEUNE;
LAUREN WOOD; LINDA PARSONS,

      Plaintiffs-Appellees,

and

ALEX MATEUS,

      Consolidated-Plaintiff-Appellee,

v.

JOHN NJORD, UDOT Executive
Director; MARK VELASQUEZ,
UDOT Right-of-Way Control
Coordinator; NAZEE TREWEEK
UDOT Distrct Permits Officer,

      Defendants-Appellants.

No. 13-4173

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. Nos. 2:11-CV-00394-RJS-BCW and 2:11-CV-0910-CW)**

J. Clifford Petersen, Assistant Attorney General (Joni J. Jones and Kyle J. Kaiser,
Assistant Utah Attorneys General, with him on the briefs), Salt Lake City, Utah,
for Defendants-Appellants.

Stewart Gollan, of the Utah Legal Clinic, (John Mejia and Leah Farrel, ACLU of
Utah, with him on the brief), Cooperating Attorney for the Utah Civil Rights &
Liberties Foundation, Salt Lake City, Utah, for Plaintiffs-Appellees.

Before **BRISCOE,** Chief Judge, **HARTZ** and **HOLMES**, Circuit Judges.

**BRISCOE**, Chief Judge.

Before the Utah Department of Transportation will grant a permit authorizing a parade on a Utah state highway, an applicant must obtain liability insurance and sign an indemnification form. Two environmental groups brought suit in the United States District Court for the District of Utah, challenging these requirements under the First Amendment. The district court granted summary judgment in favor of the plaintiffs, holding that the permit requirements are facially invalid. Officials from the Utah Department of Transportation (John Njord, Mark Velasquez, and Nazee Treweek, collectively "Utah" or "UDOT") appeal. We exercise appellate jurisdiction under 28 U.S.C. § 1291 and affirm.

**I**

iMatter Utah[1] is an unincorporated, voluntary association concerned with raising awareness of climate change. As part of this effort, iMatter organized a parade scheduled for May 7, 2011. The group planned to march down State Street past various government buildings in Salt Lake City, Utah. Salt Lake City

---

[1] The named plaintiffs affiliated with iMatter Utah are Ryan Pleune, Lauren Wood, and Linda Parsons. For convenience, we refer to them collectively as "iMatter Utah" or simply "iMatter."

granted the group a free-expression permit for the event.  But because State Street is a Utah state highway, which falls under Utah's jurisdiction, the free-expression permit was conditioned on the group's ability to obtain an additional permit from UDOT.

Before UDOT will grant a permit authorizing a parade on a Utah state highway, an applicant must satisfy two requirements.[2]  First, the applicant must "obtain and provide proof of liability insurance at time of application naming the 'State of Utah, the Department and its employees' as additional insured under the certificate, with a minimum of $1,000,000 coverage per occurrence and $2,000,000 in aggregate."  Utah Admin. Code r. 920-4-5.  Second, the applicant must sign an indemnification form.  Id.  The indemnification form provides:

> The Permittee shall indemnify, defend and hold the State of Utah, the Utah Department of Transportation, the Utah Transportation Commission, the Utah Highway Patrol and their officers, agents and employees harmless from and against any claim or demand for loss, liability for damage, including claims for bodily injury, wrongful death or property damage, arising out of or resulting from: (a) any act or omission by the Permittee, its officers, agents, employees or any persons under Permittee's control insofar as permitted by law concerning Permittee's use or occupancy of the state road right-of-way; and (b) from and against all actions, suits, damages and claims brought or made by reasons of Permittee's non-observance or non-performance of any of the terms of the Permit or the rules, regulations, ordinances and laws of the federal, state or local

---

[2] In May 2011, the Utah Department of Transportation also required applicants to sign a liability waiver.  UDOT has since amended its regulations and no longer requires the waiver.  See Utah Admin Code r. 920-4-6.  As a result, this appeal addresses only the insurance and indemnification requirements.

3

governments.

App. 944.

iMatter claimed that it could not afford the required insurance and sought a waiver from UDOT.  When UDOT declined that request, iMatter sought a temporary restraining order in the United States District Court for the District of Utah.  The district court denied iMatter's request.

iMatter nevertheless held its parade on May 7, 2011.  Because iMatter did not obtain a UDOT permit, the group could only march on the sidewalks of State Street.  iMatter then held a second parade on September 24, 2011.  As before, the group refused to comply with UDOT's insurance and indemnification requirements, did not obtain a permit from UDOT, and marched only on the sidewalks of State Street.

Around the same time, another environmental group confronted the UDOT permit requirements.  This group, formed by plaintiff Alex Mateus, is called Positive Change Utah.  Mateus planned to hold a parade on State Street in October 2011.  Mateus could not afford the insurance policy, and UDOT denied his application for a permit.  Mateus's parade never materialized.

Both iMatter and Mateus filed complaints challenging the constitutionality of UDOT's permit requirements in the United States District Court for the District of Utah, naming as defendants several UDOT officials.  The cases were consolidated, and all parties moved for summary judgment.  Applying the

4

Supreme Court's criteria for evaluating time, place, and manner restrictions, the district court concluded that neither permit requirement was narrowly tailored to advance Utah's interests in public safety and protecting the public fisc. The district court granted summary judgment in favor of the plaintiffs, holding that the permit requirements were facially invalid under the First Amendment and enjoining the defendants from enforcing them as currently written.[3] iMatter Utah v. Njord, 980 F. Supp. 2d 1356, 1385-86 (D. Utah 2013).

On appeal, Utah raises a single issue: whether its insurance and indemnification requirements violate the First Amendment.

## II

We review a district court's summary judgment ruling de novo, applying the same standard as the district court. EEOC v. Abercrombie & Fitch Stores, Inc., 731 F.3d 1106, 1116 (10th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In

---

[3] The district court also granted summary judgment on several other issues, none of which are at issue in this appeal. The court (1) held that iMatter Utah had standing to sue; (2) dismissed as moot the plaintiffs' claims based on previous versions of the permit requirements; (3) dismissed the plaintiffs' claims for violation of their due process rights under the Fifth and Fourteenth Amendments; (4) held that the defendants were entitled to qualified immunity and therefore awarded no damages to the plaintiffs; (5) granted the plaintiffs leave to file a motion for reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and (6) dismissed as moot the defendants' motion to exclude certain expert testimony.

5

assessing a motion for summary judgment, we view the facts, and all reasonable inferences those facts support, in the light most favorable to the nonmoving party." Abercrombie & Fitch Stores, 731 F.3d at 1116 (alteration omitted) (internal quotation marks omitted).

"[D]uly enacted laws are ordinarily presumed constitutional." Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Municipality of Golden, Colo., 744 F.2d 739, 746 (10th Cir. 1984). But "when a law infringes on the exercise of First Amendment rights, its proponent"—here, Utah—"bears the burden of establishing its constitutionality." Id.; see also Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012) ("[The] presumption [of constitutionality] does not apply when the challenged statute infringes upon First Amendment rights.").

**III**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 749 n.1 (1976); see also 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489 n.1 (1996). At its core, "the First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." Boos v.

6

Varry, 485 U.S. 312, 318 (1988) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)) (internal quotation marks omitted). Yet "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799-800 (1985). Thus, our commitment to free speech exists in balance with other government interests. However, "[i]n places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). We refer to such places as "traditional public forums." See id. at 45-46 (1983).

Here, the parties agree that State Street is a traditional public forum. See also Frisby v. Schultz, 487 U.S. 474, 481 (1988) ("[A]ll public streets are held in the public trust and are properly considered traditional public fora."). Even in a public forum, however, "the government may impose reasonable restrictions on the time, place, or manner of protected speech . . . ." McCullen v. Coakley, 134 S.Ct. 2518, 2529 (2014) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)) (internal quotation marks omitted). Such restrictions must: (1) be "justified without reference to the content of the regulated speech;" (2) be "narrowly tailored to serve a significant governmental interest;" (3) "leave open

7

ample alternative channels for communication of the information;" and (4) "not delegate overly broad licensing discretion to a government official." Id. (recognizing the first three requirements); Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 130 (1992) (recognizing the fourth requirement).

iMatter brings both facial and as-applied challenges to Utah's permit requirements.[4] iMatter Utah, 980 F. Supp. 2d at 1365. "A facial challenge considers the restriction's application to all conceivable parties, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case." Colo. Right To Life Comm. v. Coffman, 498 F.3d 1137, 1146 (10th Cir. 2007). We address iMatter's narrower, as-applied challenge first, then turn to its facial challenge. Cf. id.

a. *As-applied Challenge*

iMatter argues that the permit scheme is unconstitutional as applied to the facts of this case because Utah does not exempt indigent applicants from its insurance and indemnification requirements. In this case, the required insurance

---

[4] Utah argues that "iMatter did not bring a facial challenge to UDOT's regulation . . . ." Aplt. Br. at 29. Regardless of whether iMatter Utah properly pleaded a facial challenge in its complaint, both parties have addressed the facial validity of the regulations in their briefing and arguments before the district court and on appeal. We therefore treat this issue as though it was raised in the pleadings. Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."); accord Faustin v. City and Cnty. of Denver, Colo., 423 F.3d 1192, 1196 (10th Cir. 2010) (applying Rule 15 to allow a facial challenge not originally asserted in the complaint).

would have cost iMatter between $300 and $500.  iMatter sought a waiver from the insurance requirement, claiming that it could not afford the insurance premium.

The Supreme Court has yet to address the question whether the government must exempt indigent applicants from otherwise-constitutional permit requirements that they cannot afford, and our sister circuits disagree on the issue. See Sullivan v. City of Augusta, 511 F.3d 16, 45 (1st Cir. 2007).  Some circuits have held that permits for First Amendment activity cannot be conditioned on the applicant's ability to pay.  See Nationalist Movement v. City of York, 481 F.3d 178, 183-86 (3d Cir. 2007); Cent. Fla. Nuclear Freeze Campaign v. Walsh, 774 F.2d 1515, 1523-24 (11th Cir. 1985).[5]  Other circuits, however, have held that no indigency waiver is required, at least where there remain ample alternative forums for the speech.  See Sullivan, 511 F.3d at 41 ("Where, as here, . . . there are ample alternative forums for speech, we see insufficient justification for the district court's ruling that the Constitution mandates an

---

[5] iMatter cites another case that it claims takes this position, Coe v. Town of Blooming Grove, 567 F. Supp. 2d 543, 564 (S.D.N.Y. 2008), aff'd in part, vacated in part, and remanded by 429 Fed. App'x 55 (2d Cir. 2011).  In that case, the district court held that "[i]n contrast to whatever undefined benefit the lack of an indigency exception may provide [the defendant], the burden it imposes on the First Amendment rights of plaintiff and others of limited financial means is real, severe, and unacceptable."  567 F. Supp. 2d at 563.  Because this portion of the district court opinion was vacated by the Second Circuit, we decline to give it further consideration. 429 Fed. App'x at 58-59.

9

indigency exception . . . ."); <u>Stonewall Union v. City of Columbus</u>, 931 F.2d 1130, 1137 (6th Cir. 1991) ("Because we believe the availability of the sidewalks and parks provides a constitutionally acceptable alternative for indigent paraders, we find that the lack of an indigency exception does not render the ordinance constitutionally invalid."). We agree with the First and Sixth Circuits that, so long as there are ample alternative forums for speech, the Constitution does not mandate an indigency exception to an otherwise-valid permit requirement.

Proponents of an indigency exception often point to the Supreme Court's decision in <u>Murdock v. Pennsylvania</u>, 319 U.S. 105 (1943), which they interpret to mandate such an exception. <u>See, e.g.</u>, <u>Cent. Fla. Nuclear Freeze Campaign</u>, 774 F.2d at 1524. In <u>Murdock</u>, the Supreme Court declared that "[f]reedom of speech . . . [must be] available to all, not merely to those who can pay their own way," and that "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution." 319 U.S. at 111, 113. Out of context, this language suggests that an indigency exception might indeed be required. But we do not read <u>Murdock</u> so broadly.

In <u>Murdock</u>, the Court invalidated a license tax—imposed on Jehovah's Witnesses distributing literature and soliciting donations from door to door—under circumstances where the failure to obtain the license would completely foreclose the plaintiffs' protected First Amendment activity. <u>Id.</u> at 106, 117 ("The ordinance . . . sets aside the residential areas as a prohibited zone,

10

entry of which is denied petitioners unless the tax is paid."). In striking down the license tax at issue there, however, the Court was careful to distinguish it from "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question," id. at 113-14, leaving open the possibility that such fees would be acceptable. Indeed, such fees were later upheld in the context of parade licensing requirements. Cox v. New Hampshire, 312 U.S. 569, 576-77 (1941) (upholding a parade permit fee designed to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed"). Murdock therefore turned not on the existence of the fee or on the financial ability of the plaintiffs to pay that fee, but rather on the fact that the fee stood between the plaintiffs and any exercise of their protected First Amendment activity.

Here, by contrast, the parade participants were not completely foreclosed from engaging in their protected activity: they were able to march along State Street's sidewalks. Indeed, the district court concluded that the availability of the sidewalk and adjacent streets provided "adequate alternative channels of communication for the Plaintiffs to convey their message to their intended audience." iMatter Utah, 980 F. Supp. 2d at 1383-84. It is true, as the district court noted, that the Plaintiffs' indigence denied them the ability to present their message as effectively as they might have had they had access to State Street itself, but it did not deny them the ability to disseminate their message. Id. As

11

the First Circuit noted in Sullivan, "[t]here is a vast number of areas in which a lack of funds may disadvantage an individual, and a constitutional determination that in civil matters an indigent need not pay costs ordinarily imposed on others is a matter to be approached with some caution." 511 F.3d at 45. The Supreme Court "has not suggested that an indigency exception is constitutionally required. If one is to be created under the aegis of the First Amendment, surely that is for the Supreme Court to decide in the first instance." Id.

Thus, iMatter's as-applied challenge fails. Of course, there may be circumstances in which the First Amendment requires us to accommodate indigent people whose rights are infringed upon by fees they are not capable of paying. We simply hold that, on the facts of this case, Utah's failure to provide a waiver to indigent applicants does not render its permit scheme unconstitutional.

This conclusion does not end our analysis, however, because iMatter Utah also brings a facial challenge to Utah's insurance and indemnification requirements. We turn now to that analysis.

b. *Facial Challenge*

In a facial challenge, we simply "apply[] the relevant constitutional test to the challenged statute . . . ." Doe v. City of Albuquerque, 667 F.3d at 1124. That test requires us to determine whether Utah's regulations: (1) are content neutral; (2) are "narrowly tailored to serve a significant governmental interest;" (3) "leave open ample alternative channels for communication;" and (4) "do not delegate

12

overly broad licensing discretion to a government official." McCullen, 134 S. Ct. at 2529 (recognizing the first three requirements); Forsyth Cnty., 505 U.S. 123, 130 (1992) (recognizing the fourth requirement). The district court concluded, and the parties do not dispute, that the insurance and indemnification requirements are content neutral. iMatter Utah, 980 F. Supp. 2d at 1368. We agree, and therefore turn to the question whether the insurance and indemnification requirements are narrowly tailored to serve a substantial government interest.

"To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." McCullen, 134 S. Ct. at 2540. Put differently, the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). However, a time, place, or manner restriction "need not be the least restrictive or least intrusive means" of furthering a government's legitimate interests. Id. at 798-9. In other words, "restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." Id. at 798 (internal quotation marks omitted).

Thus, "the scope of the restriction on speech must be reasonably, though it need not be perfectly, targeted to address the harm intended to be regulated." 44

13

Liquormart, Inc., 517 U.S. at 529 (O'Connor, J., concurring); accord Bd. of Trs. of State of N.Y. v. Fox, 492 U.S. 469, 480 (1989). In short, "fit matters." McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1346 (2014). "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrific[ing] speech for efficiency." McCullen, 134 S. Ct. at 2534 (second alteration in original) (internal quotation marks omitted).

Utah identifies two interests that it seeks to serve with its permit requirements. First, Utah contends that it has "a significant governmental interest in maintaining public order, preventing traffic and sidewalk obstructions, and promoting safety." Aplt. Br. at 17-18. Second, it asserts that it has "a legitimate interest in recovering expenses it incur[s] in the production of [a] parade as well as in protecting itself from liability for injuries associated with the use of its property." Id. at 18.

We accept the general proposition that promoting public order and safety is a significant government interest. But Utah has failed to present any evidence that its insurance and indemnification requirements actually address that interest. Indeed, the district court concluded that the insurance and indemnification requirements have no "effect on the likelihood that some sort of accident will occur during [an] event." iMatter Utah, 990 F. Supp. 2d at 1371. Simply put, a regulation that has no discernible effect on an objective is not narrowly tailored to

14

achieve that objective. Accordingly, as Utah conceded before the district court, the real "issue is the money, the public fisc." App. Vol. VII at 1389.

Utah's second stated interest, protecting the fisc, has two separate components. Utah claims an interest in both recovering expenses and protecting itself from liability for injuries associated with the use of its property. As with the safety interest, we find that Utah has presented no evidence that its insurance and indemnification requirements have any effect on the direct expenses Utah incurs in hosting a parade. For example, these requirements do not appear to force a permittee to reimburse Utah for police overtime, crowd control expenses, or road cleanup.

This leaves Utah with a single interest—protecting itself from liability. The plaintiffs do not dispute that the interest is a significant one. Aplee. Br. at 19; cf. Thomas v. Chicago Park Dist., 534 U.S. 316, 322 (2002) (upholding a permit system that "assure[d] accountability for damage caused by [an] event."). Thus, the precise question becomes whether Utah's insurance and indemnification requirements are narrowly tailored to further the State's interest in protecting itself from liability for injuries associated with the use of its property. We address the insurance and indemnification requirements separately.

*1. Insurance Requirement*

Utah argues that the insurance requirement is narrowly tailored because the sidewalk is an available, worthy alternative to the street, Aplt. Br. at 21-27, 38-

40, and because there is an "exact fit" between the insurance requirement and the State's interest in protecting itself from financial loss. Aplt. Br. at 30. We reject both of these arguments.

According to Utah, because there are "ample, alternative channels available"—namely, sidewalks—"UDOT's regulations satisfy the First Amendment." Aplt. Br. at 40. In other words, Utah contends that if a regulation leaves open ample alternative forums for communication, then that regulation is narrowly tailored. The district court rejected Utah's position, concluding that it "improperly conflated the government's need to narrowly tailor its regulations with its need to demonstrate ample alternatives for free speech." iMatter Utah, 980 F. Supp. 2d at 1372. "Even if ample alternatives for speech exist," the district court explained, "the State cannot simply prohibit a group from speaking in a traditional public forum without demonstrating how the State's restriction on speech is narrowly tailored to serve a significant interest." Id. We agree. Although a narrowly tailored regulation may tend to leave open ample alternatives for communication, there is no basis for substituting one requirement for the other.

In articulating the test for time, place, and manner restrictions, the Supreme Court has consistently listed the ample alternatives requirement and narrow tailoring requirement conjunctively. See, e.g., Forsyth, 505 U.S. at 130 ("[A]ny permit scheme controlling the time place, and manner of speech must not be

16

based on the content of the message, must be narrowly tailored to serve a significant governmental interest, *and* must leave open ample alternatives for communication." (emphasis added)); accord Perry Educ. Ass'n, 460 U.S. at 45; Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., Kan., 492 F.3d 1164, 1180 (10th Cir. 2007). Moreover, a restriction that meets the ample alternative requirement can fail the narrow tailoring requirement. See United States v. Grace, 461 U.S. 171 (1983). Having rejected Utah's first argument, we turn to its second argument.

Utah characterizes the insurance requirement as an "exact fit," with Utah's interest in protecting itself from financial loss. Aplt. Br. at 30. In Utah's view, "all street marches create greater potential liability than any sidewalk march." Id. at 33. But it provides no evidence to support this assertion, and it is hardly self-evident.[6] For example, the parties agree that, had iMatter obtained UDOT permits, the Salt Lake City Police Department would have "provided traffic control and closed the streets to traffic while the march was underway." Aplee. Br. at 18; see also Aplt Br. at 33. And the record shows that, when iMatter conducted its parade on the sidewalks along State Street, its "crowd of march

[6] Utah argues that "Plaintiffs produced no evidence that some street marches would not create the same increased potential risk of liability over sidewalk marches that other street marches would." Aplt. Br. at 33. But it is Utah, not iMatter, that bears the burden of producing evidence. See, e.g., ACORN, 744 F.2d at 746.

17

participants ballooned off the sidewalk and into the street where there was oncoming traffic." Aplee. Br. at 10. This suggests that, at least in some circumstances, a liability-creating accident could be more likely during a sidewalk march than during a street march. But even if we set aside Utah's dubious claim that street parades are inherently more likely than other marches to result in liability, Utah's insurance requirement still fails to meet the narrow tailoring requirement.

The cost of obtaining a permit must align with the cost borne by the government in hosting the permittee's expressive activity. In the seminal permit case of Cox v. New Hampshire, for example, the Supreme Court upheld a permit requirement that promoted public order by enabling authorities both to prepare for a disruption to the public's use of the streets and to ensure that only one parade marched at a time. 312 U.S. at 576-78. The Court approved the license fee, which could range from a nominal amount to $300, because the flexible structure of the fee "t[ook] into account" the "varying conditions" that could lead to greater or lesser public expense. Id. at 576-77 (internal quotation marks omitted). Thus, the fee was constitutional because it was specifically targeted "to meet the expense incident to the administration of the [event]." Id. (internal quotation marks omitted); cf. Murdock, 319 U.S. 105, 116 (invalidating a fee not "calculated to defray the expense" incurred as a result of the expressive activity).

Even those cases on which Utah relies follow this theme. Stonewall Union

18

v. City of Columbus, for example, concerned an ordinance requiring parade permit applicants to "prepay a fee representing the cost for processing the permit application and the predetermined cost for the maintenance of traffic control along the parade route." 931 F.2d 1130, 1131 (6th Cir. 1991). The Sixth Circuit upheld the ordinance, id. at 1137, gleaning from Supreme Court precedent the lesson that a permissible fee is one "designed to meet the expenses incident to the administration of the law and the cost of maintaining public order for the parade." Id. at 1133; see also Forsyth, 505 U.S. at 129 n.8 (summarizing Stonewall as "permitting greater than nominal fees that are reasonably related to expenses incident to the preservation of public safety and order"). The fee in Stonewall was therefore unlike the fee the Supreme Court struck down in Murdock, which was "fixed in amount," "unrelated to the scope of the activities," not calculated "to defray the expenses of policing the activities," and "in [no] way apportioned." Stonewall, 931 F.2d at 1132 (citing Murdock, 319 U.S. at 113-14) (internal quotation marks omitted).

The same principle appears in another case on which Utah relies, Sullivan v. City of Augusta, 511 F.3d 16 (1st Cir. 2007). In Sullivan, the First Circuit considered the constitutionality of an ordinance requiring applicants for parade permits to pay both a processing fee of $100 and "the cost of the extra police officers and police vehicles needed to control and divert traffic during the event." Sullivan, 511 F.3d at 21. The court held that the ordinance was constitutional

19

only to the extent that the fees represented "actual administrative expenses." Id. at 38. Importantly, the court held that "[i]t [was] a violation of the First Amendment to have charged [the plaintiff] more than the actual administrative expenses of the license, as set forth in the ordinance." Id.

In this case, Utah has failed to show how the costs it imposes on applicants align with the actual expenses Utah incurs in hosting a parade. It presented no evidence justifying its required minimum insurance coverage of $1,000,000 per occurrence and $2,000,000 in aggregate. Utah Admin. Code r. 920-4-5. Because the amount of coverage is likely to affect the cost of the insurance premium, Utah must offer *some* evidence that this amount, and not some lesser amount, is necessary. See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 196 (1997) ("[I]n the realm of First Amendment questions[,] . . . [the legislature] must base its conclusions upon substantial evidence."). Utah fails to do so.

Moreover, the potential scope of Utah's liability is defined by the Governmental Immunity Act of Utah (GIAU), Utah Code §§ 63G-7-101 to 63G-7-904. See App. Vol. VII at 1369. Under the GIAU, Utah has waived sovereign immunity "as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment," Utah Code § 63G-7-301(4), as well as to "any injury caused by . . . a defective, unsafe, or dangerous condition of any highway, road, [or] street," unless the cause was a "latent" condition, Utah Code § 63G-7-301(3). However, Utah retains immunity against

20

injuries arising out of "discretionary function[s]," intentional torts, "the issuance . . . [of] any permit" or "license," and "riots, unlawful assemblies, public demonstrations, mob violence, and civil disturbances." Utah Code § 63G-7-301(5); see also Taylor ex rel. Taylor v. Ogden City Sch. Dist., 927 P.2d 159, 164 (Utah 1996) ("[T]hese subsections demonstrate that although [the statute] does not specifically refer to the conduct of those not affiliated with the government, the legislature intended to retain immunity for certain injuries arising out of the conduct of such persons."). Given Utah's broad immunity, we suspect that Utah's potential parade liability—other than liability resulting from its own conduct—should be vanishingly small. And, as we discuss below, Utah cannot require the permittee to bear the cost of insuring Utah against Utah's own negligence.

Even if Utah had presented evidence that its required coverage amounts were necessary in some cases, Utah does not narrowly tailor its insurance requirement to those situations or to any objective characteristic of the parade. For example, the location of a parade, its duration, and the number of participants might all affect the likelihood of an accident resulting in liability for Utah. By contrast, insurance requirements that have been upheld have generally been tied to the risk of an event. See, e.g., Santa Monica Food Not Bombs v. Santa Monica, 450 F.3d 1022, 1057 (9th Cir. 2006) (noting with approval that "most demonstration organizers will not have to provide insurance and even those with a

21

destructive history can avoid the insurance requirement if they choose to work with the City Manager to avoid repetition of past injuries or property damage.").

Finally, Utah's insurance requirement is not narrowly tailored because it requires permittees to purchase insurance against risks for which the permittee could not be held liable. In NAACP v. Claiborne Hardware Co., the Supreme Court held that an organization exercising its First Amendment rights may not be held liable for the conduct of a third party "without a finding that [it] authorized—either actually or apparently—or ratified unlawful conduct." 458 U.S. 886, 931 (1982). To hold otherwise would impermissibly burden the plaintiffs' First Amendment rights. Id. Utah requires the permittee to purchase insurance[7] naming Utah, UDOT, and its employees as additional insured parties. Utah Admin. Code r. 920-4-5. As the district court noted, "[t]his open language arguably requires the Plaintiffs to insure not only against occurrences that can be attributed to the actions of a participant in the march, but also against incidents for which the Plaintiffs cannot be held liable, such as the reactions of third-party bystanders or the actions of police officers or other employees of the State." 980 F. Supp. 2d at 1374. Utah cannot use its insurance requirement to indirectly impose costs on organizations that it could not impose on them directly.

We therefore hold that Utah's insurance requirement is not narrowly

---

[7] Utah confirmed that "insurance" means "general liability insurance." App. Vol. VII at 1411-12.

22

tailored to its interest in protecting itself from financial liability, and consequently, that it violates the First Amendment.

## 2. *Indemnification Requirement*

Utah's indemnification requirement is concerned with suits brought by third parties against the State for losses that result from an applicant's march, the applicant's violation of the law, or the applicant's violation of the terms of the permit. For any such suit, the indemnification provision requires the applicant to indemnify Utah, defend Utah, and hold Utah harmless. Thus, it does not require applicants to bear the cost of litigation arising from Utah's own actions or the actions of third parties. Cf. Forsyth, 505 U.S. at 134-35 (holding that "[s]peech cannot be financially burdened . . . simply because it might offend a hostile mob"); Claiborne, 458 U.S. at 931 (holding that an organization could not be held liable for the acts of third parties not under its control); Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1039-40 (9th Cir. 2008) (holding that an indemnification requirement was not narrowly tailored because it required groups to indemnify the city for accidents and injuries not caused by the group).

We acknowledge that Utah's indemnification requirement avoids many of the pitfalls of similar requirements that have been struck down and is narrower in scope than Utah's insurance requirement. See iMatter Utah, 980 F. Supp. 2d at 1380-83. This, however, does not mean that Utah has met its burden of showing that its indemnification requirement is narrowly tailored to serve a significant

23

governmental interest.  Cf. Doe v. Albuquerque, 667 F.3d at 1131 ("General

reference to other cases involving other cities, other restrictions, other interests to

be served, and other constitutional challenges do not relieve the City's burden in

this case.").

Our concern lies primarily with the permittee's duty to defend Utah "from

and against all actions, suits, damages and claims brought or made by reasons of

[the permittee]."  App. 944.  As we discussed above, sovereign immunity and

traditional agency and tort principles make it difficult to imagine how Utah could

be liable to third parties for any action by a permittee.  All that remains is a duty,

on the part of the permittee, to defend Utah against frivolous or meritless

lawsuits.[8]  Moreover, Utah has offered no evidence that its existing tort and

---

[8]We acknowledge that the organizers of a march could be subjected to such baseless litigation regardless whether they agree to indemnify Utah. But because Utah provides no justification for this aspect of the requirement, we need not decide the question whether requiring permittees to defend the state against such litigation would be constitutionally valid. However, we note that the cost of defending even a baseless lawsuit can be substantial and the risk that such a lawsuit will occur cannot be predicted at the time of application for a permit. The duty to defend Utah against even meritless litigation therefore raises the possibility of a "heckler's veto," by which "[t]hird parties who disagree with the content of [an] organization's speech could . . . punish an organization after the event." iMatter Utah, 980 F. Supp. 2d at 1381; cf. Santa Monica Food Not Bombs, 450 F.3d at 1051 n.26 (Berzon, J., dissenting) ("It would be simple to change the requirement so that permittees must reimburse the City only for the cost of *meritorious* lawsuits, which by definition would not permit damages for constitutionally protected speech and would also remove the threat that permittees will be subject to an after-the-fact heckler's veto in the form of a costly, non-meritorious lawsuit." (emphasis in original)).

24

criminal law is insufficient to regulate the behavior of the permittees themselves. For example, Utah could presumably have recovered damages from iMatter directly if iMatter had negligently damaged public property during the course of the parade.

Utah argues that its indemnification requirement is consistent with one upheld by the Ninth Circuit in Kaahumanu v. Hawaii, 682 F.3d 789 (9th Cir. 2012). We disagree. In Kaahumanu, the court addressed the constitutionality of a law requiring people engaging in "commercial activities of any kind" on a public beach to obtain a permit that required an applicant to obtain "comprehensive public liability insurance" naming the state as an additional insured and to agree to indemnify and hold harmless the state. Id. at 794. Like Utah's indemnification provision, the provision at issue in Kaahumanu required an applicant to indemnify, defend, and hold harmless the state only from claims arising from the applicant's conduct. Compare id. at 809-10, with App. 944. But, importantly, unlike Utah's parade regulations,"[Hawaii's] regulations . . . d[id] not on their face seek to regulate spoken words or patently expressive or communicative conduct, such as picketing or handbilling." Kaahumanu, 682 F.3d at 801 (internal quotation marks and alterations omitted). The Ninth Circuit therefore allowed only an as-applied challenge to the insurance and indemnification provisions.[9]

---

[9] The court did allow a facial challenge to portions of the law that the
(continued...)

25

Utah's insurance and indemnification requirements, by contrast, apply facially to core expressive activity such as the political demonstration planned by iMatter. We conclude that this important difference renders <u>Kaahumanu</u> inapplicable.

Thus, we hold that Utah's indemnification requirement is not narrowly tailored to Utah's interest in protecting itself from financial liability and consequently violates the First Amendment.

## IV

Because we conclude that Utah's insurance and indemnification requirements are not narrowly tailored to serve a significant governmental interest, we AFFIRM.

---

[9](...continued)
plaintiffs claimed gave government officials "unbridled discretion," 682 F.3d at 801-02, but no such claim was made in the present case. In any event, the Ninth Circuit struck down that portion granting officials discretion to revoke or modify a permit. <u>Id.</u> at 807.