BALDOCK, Circuit Judge.
In 2016, the Sandy City, Utah city council adopted an ordinance making it illegal for any person "to sit or stand, in or on any unpaved median, or any median of less than 36 inches for any period of time." Sandy City Traffic Code, Article 16, Section 299.1 (the Ordinance). After the Sandy City council adopted the Ordinance, Plaintiff-Appellant Steve Ray Evans received four citations for violating the Ordinance when he stood on narrow or unpaved medians. Evans filed suit against the City and many of its officials under 42 U.S.C. § 1983 in the district court of Utah, alleging the Ordinance is facially invalid because it violates the First Amendment right to free speech. Evans also asked the district court to grant his request for a preliminary injunction. The City filed a motion for summary judgment and the court allowed discovery. After a hearing on the motion, the district court denied Evans' preliminary injunction and granted summary judgment in favor of the City because the Ordinance was a valid time, place, or manner restriction on speech.[1] Evans appealed, arguing the district court incorrectly applied the time, place, or manner standard and wrongly granted summary judgment because the City did not satisfy its evidentiary burden. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.
I.
We review a district court's summary judgment ruling de novo, applying the same standard as the district court. iMatter Utah v. Njord , 774 F.3d 1258, 1262 (10th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, "we review the facts and all reasonable inferences those facts support, in the light most favorable to the nonmoving party." iMatter , 774 F.3d at 1262 (citation omitted). Because this decision implicates First Amendment freedoms, we perform an independent examination of the whole record in order to ensure that the judgment protects the *1176 right of free expression. Faustin v. City and Cty. of Denver , 423 F.3d 1192, 1196 (10th Cir. 2005). Here, the City carries the burden to justify the Ordinance with uncontested facts. See iMatter , 774 F.3d at 1263.
II.
Today, we confront whether the Ordinance, which prohibits the sitting or standing on medians that are unpaved or less than 36 inches wide (hereinafter "affected medians"), violates the First Amendment. The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const. amend. I. The First Amendment "applies not only to legislative enactments, but also to less formal governmental acts, including city policies," such as the Ordinance at issue. Hawkins v. City and Cty. of Denver , 170 F.3d 1281, 1286 (10th Cir. 1999).
A.
As a threshold matter, we must first consider whether the activity in question constitutes protected speech under the First Amendment. See Cornelius v. NAACP Legal Def. & Educ. Fund., Inc ., 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("[I]f [the speech] is not [protected], we need go no further."). Here, Evans contends the Ordinance restricts his ability to panhandle and solicit financial support. According to the Supreme Court, "the solicitation of charitable contributions is protected speech." Riley v. Nat'l Fed'n of the Blind of N.C., Inc ., 487 U.S. 781, 789, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). Neither the Supreme Court nor this Circuit has directly addressed whether panhandling is protected speech under the First Amendment but several of our sister circuits who reached the question determined panhandling is protected. See Reynolds v. Middleton , 779 F.3d 222, 225 (4th Cir. 2015) ; Speet v. Schuette , 726 F.3d 867, 870 (6th Cir. 2013) ; Smith v. City of Fort Lauderdale , 177 F.3d 954, 956 (11th Cir. 1999) ; Loper v. N.Y.C. Police Dep't , 999 F.2d 699, 704 (2d Cir. 1993). Assuming without deciding panhandling is protected under the First Amendment, as we will explain later, the Ordinance is a valid time, place, or manner restriction. See Gresham v. Peterson , 225 F.3d 899, 904-05 (7th Cir. 2000) (after "assuming ... some panhandler speech would be protected by the First Amendment," the Seventh Circuit applied the First Amendment "time, place, and manner" framework.).
We note that while solicitation and panhandling laws are on the books in cities across the United States and challenges to such laws have been similarly widespread, an astute reader will recognize the Ordinance challenged here is not a ban on panhandling or solicitation like many other ordinances. Instead, the Ordinance is a restriction on sitting or standing on narrow and unpaved medians. This distinction will become important later, but for now we assume Evans' form of speech, panhandling, is protected speech.
B.
We turn next to the nature of the forum affected by the Ordinance. Under First Amendment jurisprudence, "the extent to which the Government can control access [to Government property] depends on the nature of the relevant forum." Cornelius , 473 U.S. at 800, 105 S.Ct. 3439. The Supreme Court has identified three categories of Government property subject to First Amendment analysis: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n , 460 U.S. 37, 45-46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). A traditional public forum is a place that "by long tradition or by government *1177 fiat ha[s] been devoted to assembly and debate." Id . at 45, 103 S.Ct. 948. "Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." Cornelius , 473 U.S. at 800, 105 S.Ct. 3439 (citing Perry , 460 U.S. at 45, 103 S.Ct. 948 ). In contrast, designated public fora are places that are not generally open to the public for First Amendment activity and "are created by purposeful governmental action" to allow speech activity. Arkansas Educ. Television Com'n v. Forbes , 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). A nonpublic forum is anything that does not qualify as a traditional or designated public forum. Access to a nonpublic forum "can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.' " Cornelius , 473 U.S. at 800, 105 S.Ct. 3439 (quoting Perry , 460 U.S. at 46, 103 S.Ct. 948 ) (alteration in original).
Evans contends "[m]edians are widely considered [traditional] public fora" whereas the City contends the affected medians are nonpublic fora. The district court did not decide the issue, concluding the forum designation was not dispositive since the Ordinance was valid even under the stricter standard for traditional public fora. We agree with the district court. As we will explain, the Ordinance is a valid time, place, or manner regulation; thus, we need not decide if the affected medians are more appropriately classified as nonpublic fora.[2]
C.
Assuming without deciding the affected medians are traditional public fora, we turn to whether the Ordinance is a valid restriction of protected speech. It is well-settled "that even in a public forum the government may impose reasonable restrictions on the time, place, and manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of information.' " Ward v. Rock Against Racism , 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting Clark v. Cmty. for Creative Non-Violence , 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ). We address each of the three requirements in turn.
1. Content Neutrality
Recall, the Ordinance proscribes any person "to sit or stand, in or on any unpaved median, or any median of less than 36 inches for any period of time." Sandy City Traffic Code, Article 16, Section 299.1. No one disputes the Ordinance is facially content neutral because it "does not draw content-based distinctions on its face." McCullen v. Coakley , 573 U.S. 464, 134 S. Ct. 2518, 2531, 189 L.Ed.2d 502 (2014). The law applies evenhandedly to all who sit or stand on narrow or unpaved medians irrespective of the content of their message.
*1178 Even though the Ordinance is content-neutral on its face, the Ordinance may nevertheless be content-based if the government adopted the Ordinance "because of disagreement with the message it conveys." Ward , 491 U.S. at 791, 109 S.Ct. 2746. "The government's purpose is the controlling consideration . A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Id . (emphasis added). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.' " Id. (quoting Cmty. for Creative Non-Violence , 468 U.S. at 293, 104 S.Ct. 3065 ).
The record indicates the City justified the Ordinance without reference to the content of the regulated speech. Specifically, the City police captain explained during a City council meeting that people sitting or standing on narrow or unpaved medians are a public safety hazard. The police captain explained the Ordinance sought to limit that danger because there had been "several close calls" where accidents involving pedestrians and vehicles "could [have] be[en] devastating." The City's public safety justification is further confirmed by the process the City prosecutor used to draft the Ordinance. First, the City prosecutor received notice the police "were having some problems with safety issues" with people falling into traffic. To deal with this problem, the City prosecutor set out to draft the Ordinance. He gathered information by surveying the City's medians. Then, he drafted the Ordinance to exclusively target medians where it was dangerous to sit or stand for any length of time, regardless of the speech that might occur. In his judgment, paved medians less than 36-inches wide were dangerous to sit or stand on because they were too narrow to provide refuge from passing cars. He also concluded unpaved medians, which were typically covered in rocks, boulders, and in some cases shrubs, were dangerous because pedestrians could easily lose their footing or trip on uneven surfaces. At all times, the City has maintained its sole justification for the Ordinance is to promote public safety.
In spite of this clear public safety purpose, Evans contends the Ordinance is not content neutral because the City acted, in part, because it disagreed with panhandling. Evans suggests the City's public safety justification is a façade for its improper motive to suppress panhandlers' speech. In support, Evans points to one question and one statement made by two councilmembers at the City council meeting where the police captain presented the proposed Ordinance. One councilmember asked, "we're going to give homeless people citations?" No reasonable factfinder could conclude this question provides evidence the City adopted the Ordinance "because of a disagreement with the content" of panhandlers' speech. At most, the question reveals one councilmember acknowledged the Ordinance would have an incidental effect on panhandling. But it is well-settled such an incidental effect on some speakers or messages does not make a regulation content-based. See Ward , 491 U.S. at 791, 109 S.Ct. 2746 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); see also City of Renton v. Playtime Theatres, Inc ., 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (classifying a restriction on the location of adult movie theaters as content neutral because the ordinance was aimed not at the content of the films shown, but rather at the secondary effects of such theaters on the surrounding community); McCullen , 134 S. Ct. at 2531 (classifying an ordinance that exclusively restricted *1179 speech at abortion clinics as content neutral because the ordinance was aimed at public safety, even though it had an incidental effect on abortion-related speech). Therefore, this question most certainly does not turn the Ordinance into a content-based restriction.
Additionally, Evans contends a councilmember's statement, "And I don't even know who stops there to give them anything in the middle of traffic as it's going," shows the City adopted the Ordinance because it disagreed with panhandling. Like the councilmember's question, no reasonable factfinder could conclude the statement provides evidence the City adopted the Ordinance because of a disagreement with the content of panhandler's speech. This is especially true when the statement is read in context. The councilmember's entire statement and the City police captain's response indicates the councilmember endorsed the Ordinance to promote public safety:
I drove 106th the other day at about noon and there were four people standing on [a] median and they were talking, you know, this group of guys were just talking there and, boy, if one of them would have stepped backwards a foot-'cause they were on [a median] narrower than three feet-[Police Captain: "Correct"]-they would've been just wiped out-[Police Captain: "I believe it is approximately 16 inches"]-Really it was scarey [sic] for me and it's for their own safety, you know. And I don't even know who stops there to give them anything in the middle of traffic as it's going.
This statement supports the City's public safety justification for passing the Ordinance. Conspicuously, the statement says nothing about the content of panhandlers' speech, let alone provides evidence the City passed the Ordinance because it disagreed with their message. Accordingly, the Ordinance is content neutral.[3]
2. Narrowly Tailored to Serve a Significant Government Interest
"Even though the [Ordinance] is content neutral, it still must be 'narrowly tailored to serve a significant governmental interest.' " McCullen , 134 S. Ct. at 2534 (quoting Ward , 491 U.S. at 796, 109 S.Ct. 2746 ). No one disputes the Ordinance serves a significant governmental interest in promoting public safety. In fact, even Evans acknowledges "[t]here's no real dispute about whether keeping cars and pedestrians away from each other would, at least in some way, make Sandy City a safer place." Op. Br. at 25 (citing Int'l Soc'y for Krishna Consciousness v. City of Baton Rouge , 668 F. Supp. 527, 530 (M.D. La. 1987) ("It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous.")). With both parties in agreement, we need not belabor the point: the Ordinance promotes public safety in a direct and effective way by keeping pedestrians off thin slices of pavement and unpaved traffic dividers where pedestrians could be injured by passing traffic.
We turn, instead, to the hotly contested question: whether the Ordinance is narrowly tailored to serve that interest. To be narrowly tailored, the Ordinance must not "burden substantially more speech than is necessary to further the government's legitimate interests." Ward , 491 U.S. at 799, 109 S.Ct. 2746. In other *1180 words, the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." McCullen , 134 S. Ct. at 2535 (quoting Ward , 491 U.S. at 799, 109 S.Ct. 2746 ). This requirement demands a "close fit between ends and means" to ensure speech is not sacrificed for efficiency. Id . at 2534. We look "to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve." Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton , 536 U.S. 150, 165, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002).
At the same time, such regulation "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " Ward , 491 U.S. at 798-99, 109 S.Ct. 2746 (quoting United States v. Albertini , 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) ). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800, 109 S.Ct. 2746. " 'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interest should be promoted." Id . at 800, 109 S.Ct. 2746 (quoting Albertini , 472 U.S. at 689, 105 S.Ct. 2897 ).
Here, the City adopted the Ordinance to promote "public health, safety and [the] welfare of the City" after there had been several "close calls" where individuals reported pedestrians on medians in dangerous situations. Evans nevertheless contends the Ordinance is not narrowly tailored. To this end, Evans makes three main arguments. We address each in turn.
a.
First, relying on McCullen , Evans claims the Ordinance places a substantial burden on speech because it requires him to sit or stand a substantial distance away from the most effective places to communicate with his target audience. In McCullen , the Supreme Court determined an ordinance requiring a buffer zone around abortion clinics imposed a substantial burden on speech and "effectively stifled petitioners' message" because the ordinance prevented petitioners from engaging in close, personal conversations with their target audience of women entering the clinics. McCullen , 134 S. Ct. at 2536-37. Similarly, Evans claims standing on medians where he can talk to drivers in vehicles is the most effective way to communicate with his target audience and the Ordinance prevents him from doing so.
We are not persuaded. Evans received two citations for standing on a paved 17-inch median. A mere ten feet away from where he was cited, the median is wider than 36 inches and is therefore unaffected by the Ordinance. We simply cannot accept this ten-foot difference on the same median as a substantial burden on speech. In compliance with the Ordinance, Evans can stand on wide, paved medians to communicate effectively with his target audience. Unlike McCullen , the Ordinance does not effectively stifle Evans' ability to *1181 communicate his message to his target audience.
b.
Second, Evans contends the City failed to show it properly balanced speech against safety. To ensure a regulation does not burden substantially more speech than necessary to further the government's interests, narrow tailoring requires "a close fit between ends and means" to ensure speech is not sacrificed for efficiency. McCullen , 134 S. Ct. at 2534-35 (citing Nat'l Fed'n of the Blind , 487 U.S. at 795, 108 S.Ct. 2667 ). Fit matters, but narrow tailoring "does not require perfect tailoring. The doctrine requires only that a challenged speech restriction not burden 'substantially' more speech than is necessary to further the government's interest." Cutting v. City of Portland , 802 F.3d 79, 86 (1st Cir. 2015).
Evans contends the City did not meet its burden to justify the fit between the ends and the means when it failed to "compile any data, statistics, or accident reports." According to Evans, "[u]nder McCullen , Sandy City's failure to conduct research and analysis is dispositive. ... Indeed, that's the grit of McCullen : governments must provide real evidence to justify their public safety concerns." In McCullen , the Supreme Court explained evidence of a problem at one abortion clinic at one time did not justify the burden on other clinics at other times. Specifically, the Supreme Court stated, "Respondents point us to no evidence that individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access. For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth [of Massachusetts] is hardly a narrowly tailored solution." McCullen , 134 S. Ct. at 2539. The Supreme Court's language does not create a new evidentiary requirement for governments to compile data or statistics. Instead, governments bear the same burden to show a regulation does not "burden substantially more speech than is necessary to further the government's legitimate interests." Id . at 2535 (quoting Ward , 491 U.S. at 799, 109 S.Ct. 2746 ).
Here, a direct relationship exists between the City's goal of promoting public safety and the restriction on speech it selected. The Ordinance is limited only to those medians where it is unsafe to sit or stand. The City police captain-a City official who had years of experience dealing with unsafe situations involving pedestrians on medians in Sandy City-conducted a survey of the medians in Sandy City. The City prosecutor also surveyed the medians within the City. Based on what they observed, the City drafted the Ordinance limiting it only to those medians where it would be dangerous to sit or stand at any time of day, at any traffic speed or volume. The City prosecutor explained he included unpaved medians where the "footing isn't uniform," which posed a tripping hazard. He included narrow medians after walking on them and determining what width would provide sufficient refuge from passing traffic. Such evidence is sufficient to satisfy the City's burden to show the Ordinance does not "burden substantially more speech than is necessary to further the government's legitimate interests." Id. (quoting Ward , 491 U.S. at 799, 109 S.Ct. 2746 ). The Ordinance only prohibits sitting or standing on narrow or unpaved medians where it would be dangerous to do so. This is the sort of close fit the narrow tailoring requires.
Evans also contends the City failed to satisfy its evidentiary burden because it did not provide accident reports or complaints regarding medians in all parts of the City. Evans would have this Court require the City to restrict speech in a *1182 piece-meal fashion, median by median, only upholding an ordinance after there is a report of a "close call" on a particular median, or worse, someone gets injured. The First Amendment "prevents the government from too readily 'sacrific[ing] speech for efficiency.' " Id . at 2534-35 (quoting Nat'l Fed'n of the Blind , 487 U.S. at 795, 108 S.Ct. 2667 ). It does not require the government to wait for accidents to justify safety regulations. See Traditionalist American Knights of the Ku Klux Klan v. City of Desloge , 775 F.3d 969, 975 (8th Cir. 2014) ("The fact that a pedestrian had not yet been hit while distributing materials in the city did not mean that it was not dangerous, for a government need not wait for accidents to justify safety regulations.") (quotations omitted).
c.
Third, Evans argues the Ordinance is not narrowly tailored because the City did not demonstrate alternative measures that burden substantially less speech would fail to promote public safety. According to Evans, since the City did not "prove that it actually tried other methods to address the problem," such as alternatives that distinguish between high and low traffic areas, traffic volume or time of day, we should strike down the Ordinance as not narrowly tailored. Op. Br. at 31. (quoting Reynolds , 779 F.3d at 231 (emphasis in original)).
"[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." Ward , 491 U.S. at 798, 109 S.Ct. 2746. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest , ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800, 109 S.Ct. 2746 (emphasis added). In other words, we do not even reach the question of whether "the government's interest could be adequately served by some less-speech-restrictive alternative" if the Ordinance is not "substantially broader than necessary" to promote the City's interest in public safety. Id . McCullen does not change that. In McCullen , the Court determined the means chosen were substantially broader than necessary to achieve the government's interest. Accordingly, the Court explained to be narrowly tailored, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." McCullen , 134 S. Ct. at 2540. Though the Court in McCullen evaluated evidence offered in support of respondents' claim that they had attempted alternative measures, nothing in McCullen indicates that the Court sought to modify Ward 's clear rule. See id .
Here, the Ordinance is not substantially broader than necessary to promote public safety. On both narrow and unpaved medians, the restriction on speech is directly tailored to the danger. We will not invalidate the Ordinance "simply because there is some imaginable alternative that might be less burdensome on speech." Ward , 491 U.S. at 797, 109 S.Ct. 2746 (quoting Albertini , 472 U.S. at 689, 105 S.Ct. 2897 ). The City is not required to ignore the danger posed by standing on a 17-inch sliver of concrete just because lighter traffic may make it less likely one will be hit by a car. The Ordinance is narrowly tailored to the public safety problem the City sought to address. Because the means fit closely with the ends, First Amendment jurisprudence does not require the City to prove that some imaginable *1183 alternative would fail to achieve the government's interest in public safety.
3. Ample Alternative Channels of Communication
Finally, a reasonable time, place, or manner restriction of protected speech must "leave open ample alternative channels for communication of information." Ward , 491 U.S. at 791, 109 S.Ct. 2746. "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." City Council of L.A. v. Taxpayers for Vincent , 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (citations omitted). To determine whether alternative channels are adequate, courts assess in part the speaker's ability to reach his or her target audience. Ward , 491 U.S. at 802, 109 S.Ct. 2746.
No one disputes the Ordinance leaves open many alternative channels for Evans to communicate, including paved medians wider than 36 inches, every city sidewalk, and every city park. Despite the available alternatives, Evans contends sidewalks and parks are not adequate because he cannot reach his target audience-drivers in vehicles-as effectively compared to medians.
Setting aside whether Evans can "effectively" communicate with his target audience on sidewalks and in parks, the City argues roughly 7,000 linear feet of wide, paved medians in the City remain unaffected by the Ordinance. Evans does not dispute that. And critically, at no point does Evans distinguish his ability to communicate with his target audience on affected or unaffected medians. Evans' target audience is indistinguishable on affected and unaffected medians. Recall, the City cited Evans twice for standing on a narrow median. Only ten feet away from where the City cited Evans, the paved median is wider than 36 inches and therefore unaffected by the Ordinance. Given Evans "prefers to stand on medians" and he never argued wide, paved medians were inadequate to effectively communicate with drivers in vehicle, the 7,000 linear feet of unaffected medians in the City provide Evans ample alternative channels for communication with his target audience.
III.
The Ordinance-narrow in its purpose, design, and effect-does not discriminate based on content, is narrowly drawn to serve an important governmental interest, and permits Evans to express his views, including the solicitation of financial support, on literally thousands of linear feet within Sandy City. The judgment of the district court is AFFIRMED.

Mr. Evans also alleged the Ordinance violated the Eighth Amendment, the Fourteenth Amendment Equal Protection Clause, the Dormant Commerce Clause, and Title VII of the Civil Rights Act. The district court dismissed each of Evans' claims with prejudice and granted summary judgment in favor of the City. Mr. Evans does not appeal any of those claims.

Although courts have concluded medians that resemble parks are traditional public fora, we have serious reservations extending such conclusions to the affected medians in this case, some of which are 17-inch traffic dividers that have hardly been "by long tradition ... devoted to assembly and debate." Perry , 460 U.S. at 45, 103 S.Ct. 948 ; see, e.g ., Warren v. Fairfax Cty ., 196 F.3d 186, 189 (4th Cir. 1999) ("We hold that the Center Island mall is a traditional public forum" because it is "best characterized as a park or mall."). Nevertheless, we assume without deciding the affected medians are traditional public fora.

Evans also argues we should consider City councilmembers' post-enactment comments as evidence relevant to their motivations for passing the Ordinance. Evans cites no authority to support the use of such comments as bearing on legislative purpose.